Hammonton Investment and Mortgage Company v. Commissioner.
Hammonton Inv. & Mortg. Co. v. Commissioner
Docket No. 66443.
United States Tax Court
T.C. Memo 1959-212; 1959 Tax Ct. Memo LEXIS 40; 18 T.C.M. (CCH) 1025; T.C.M. (RIA) 59212; October 30, 1959
*40 Logan Morris, Esq., 1240 Land Title Building, Philadelphia, Pa., for the petitioner. George H. Bowers, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves deficiencies in income tax and an addition thereto for the years and in the amounts as set forth below: Addition to Tax
Year
Deficiency
Section 291(a)
1951
$12,772.25
1952
17,975.46
1953
21,357.12
$1,067.85
The issues for decision are: (1) Whether respondent properly reduced the amounts added by petitioner to its reserve for bad debts for each of the years in issue; and (2) whether the addition to tax for petitioner's failure to timely file its return for 1953 was proper. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. At all times material hereto, the Hammonton Investment and Mortgage Company (hereinafter referred to as the petitioner), a New Jersey corporation, maintained its principal office at Hammonton, New Jersey. It filed its Federal income tax return for the taxable year 1951 with the collector of internal revenue at Camden, New Jersey, and its *41 returns for the taxable years 1952 and 1953 with the district director of internal revenue at Camden, New Jersey. Since its organization in 1926, petitioner has engaged in the finance business. However, it was not until 1945, that it began engaging in financing the purchase of automobiles at retail and wholesale. Since then, this segment of its business has become its principal endeavor. During the years in issue, petitioner's business consisted of making loans which may be classified as follows: (a) Retail household appliance loans: These were loans made to individuals for the purchase of household appliances. The minimum amount financed was $100. The usual down payment ranged from 10 to 30 per cent. The term of the loan ran from 24 to 36 months. These loans were made under conditional sales contracts. (b) Retail automobile loans: These were loans made to individuals to finance the purchase of new and used cars. The financing was accomplished through the dealers under conditional sales contracts, petitioner retaining a lien on the title certificate. The down payment on the new car loans ranged from 20 to 30 per cent, and their average term was for 28 or 29 months. While petitioner *42 attempted to acquire a one-third down payment with respect to the used car loans, the average received was 20 to 30 per cent. The term of used car loans was 22 to 23 months. (c) Retail direct personal loans: These were loans made to individuals on promissory notes without collateral. The term of these loans ranged from 1 to 3 years. (d)(1) Wholesale floor planning of new cars: These were loans made to finance the purchase of new cars by dealers. They were made under trust agreements providing for repayment as soon as the cars involved were sold. Petitioner held no lien on the dealer's title certificate. The loan was accomplished by the dealer establishing a line of credit with petitioner, who in turn established a line of credit for the dealer with the manufacturer. As the cars were delivered to the dealer, petitioner was drawn on for the charge. There was no down payment and petitioner financed the total amount of the dealer's costs with respect to the particular car. Once each month, petitioner checked the dealer's inventory of automobiles to determine if any cars had been sold without a repayment having been made to petitioner, or sold "out-of-trust." In many instances, cars *43 had been sold "out-of-trust." However, a statement of trust was filed by petitioner; and, in the event of an "out-of-trust" sale petitioner could repossess under the trust agreement all cars held by the dealer making such a sale and sell them. In some cases petitioner resorted to this practice; however, by and large it considered it better business to allow the dealer time to acquire capital to make repayment. An "out-of-trust" sale was usually occasioned by the fact that a dealer had all of his working capital tied up in accounts receivable and used car inventories. (2) Wholesale floor planning of used cars: These loans involved the financing of the inventory and acquisition of used cars by a dealer. Petitioner loaned the money directly to the dealer. It had no lien on the title certificates, so that the dealer was in position to convey title and not pay petitioner for the car. The average term of the loan was 30 to 45 days. Petitioner was protected under these loans by the filing of a chattel mortgage statement. (e) Direct capital loans: These loans were made to dealers to provide working capital, generally to those dealers who found themselves in financial difficulties due to *44 exhaustion of their working capital in over inventory, accounts receivable, or due to mismanagement or poor business. These loans were made on notes accompanied by a chattel mortgage on the dealer's equipment, which had a limited resale value. The term of these loans ran from 3 to 5 years. Petitioner's business was primarily carried on in southern New Jersey. Its largest office was located in Atlantic City. A large number of its customers in this area were transients, being employed in Atlantic City during the summertime, and elsewhere the balance of the year. When petitioner entered the automobile finance field in 1945, it found itself in competition with nationally established finance concerns. The competition also became greater when the banks entered the field, inasmuch as they were able to extend to their customers relatively low interest charges. During the years 1951 and 1952, automobile financing was in excellent condition. A shortage of automobiles existed which established a seller's market. Repossessed cars generally could be sold for an amount equal to that owed the finance company by the defaulting purchaser. Prior to the taxable year 1951, petitioner used the *45 charge-off method of handling its bad debts. On June 21, 1951, the Commissioner granted it permission to employ the reserve method of accounting for bad debts, for that and subsequent years, and petitioner utilized the reserve method in each of the years 1951, 1952 and 1953. The amount which petitioner added to its bad debt reserve for the taxable year 1951 was arrived at after a series of conferences between its president, treasurer and auditor. It was decided that petitioner should appropriate to the reserve 1 per cent per year of its total outstanding loans until 5 per cent of the total had been reached. This policy was continued, and formed the basis for the addition to petitioner's reserve for the taxable year 1952. In arriving at the amount added to its reserve in the taxable year 1953, petitioner took into consideration certain statistics issued by The First National Bank of Chicago which it considered to be an expert in the field of automobile financing. These statistics appeared upon a schedule captioned: "Composite Ratios - Installment Sales Finance Companies." In its Federal income tax returns for the calendar years 1951, 1952 and 1953, petitioner claimed deductions *46 for additions to its reserve for bad debts in the respective amounts of $45,417.65, $47,722.23 and $69,288.06. Of these amounts, respondent allowed as deductions $20,250.65, $13,204.02 and $18,792.52, disallowing $25,167 of the addition for 1951, $34,568.21 of the addition for 1952, and $50,495.54 of the addition for 1953. Set forth below are petitioner's outstanding loans at the close of each of the years 1947 through 1958, as well as the loans made, bad debts incurred, and recoveries of bad debts previously charged off during each of those years. Dec. 31 Loans
Bad Debts
Recoveries of
Year
Outstanding
Loans Made
Incurred
Previous Charge-Offs
1947
$ 1,124,543.48
$ 2,105,468.99
$ 57.00
0
1948
1,726,182.63
5,724,055.98
0
$ 186.69
1949
2,631,652.34
7,912,028.74
1,624.30
0
1950
3,916,137.16
10,973,873.60
6,664.66
0
1951
4,797,780.78
13,040,035.07
8,237.61
0
1952
5,240,572.74
14,083,617.92
10,420.64
6,362.08
1953
7,499,268.37
17,531,209.68
16,205.39
7,751.84
1954
6,723,640.00
13,922,449.40
21,910.00
2,301.96
1955
9,669,010.00
22,647,769.19
7,771.94
4,274.35
1956
11,439,145.42
26,158,127.76
47,366.29
464.68
1957
12,871,007.90
29,319,333.60
22,639.23
7,130.03
1958
9,212,431.12
17,055,555.01
63,158.79
2,623.51
*47 Petitioner's additions to its bad debt reserve, net charges against that reserve, reserve balance, and ratio of reserve balance to its loans outstanding as of the close of each of the years in issue, as contrasted to these same items as adjusted by the respondent, are set forth below: Net
Ratio of
Additions to
Amount Charged
Reserve Balance to
Year
Bad Debt Reserve
Against Reserve
Reserve Balance
Loans Outstanding
PER PETITIONER'S BOOKS
1951
$45,417.65
$8,237.61
$ 37,180.04
0.775
1952
47,772.23
4,058.56
80,893.71
1,544
1953
69,288.06
8,453.55
141,728.22
1,890
PER RESPONDENT'S DETERMINATION
1951
$20,250.65
$8,237.61
$ 12,013.04
0.250
1952
13,204.02
4,058.56
21,158.50
0.404
1953
18,792.52
8,453.55
31,497.47
0.420
Petitioner prepared its Federal income tax return for the calendar year 1953. It was signed by the proper officers on February 6, 1954. Petitioner's secretary dictated on that date a letter of transmittal to the internal revenue service. However, due to a clerical error, the original and copy of both the return and the letter were placed in a file. Several days later, the error was discovered, *48 and a check was made out and the return mailed. The return was untimely filed on March 25, 1954. The untimely filing of petitioner's 1953 return was due to reasonable cause, and not wilful neglect. Opinion Section 23(k)(1) of the 1939 Internal Revenue Code permits the deduction "(in the discretion of the Commissioner) [of] a reasonable addition to a reserve for bad debts. * * *" To prevail, petitioner must establish that respondent's partial disallowance of the additions to its reserve for the years in issue was arbitrary or constituted an abuse of the discretion vested in him by the statute. Krim-Ko Corporation, 16 T.C. 31 (1951). Petitioner argues its past experience was of no value in determining what additions should be made to its reserve for the years in issue, because of the extraordinary state of the automotive finance business up through 1952, brought about by the existence of a seller's market for new, used and repossessed cars. It argues further that its business, by nature, involved unusual risks, occasioned principally by the fact that its only recourse in most instances, in event of default, was to seize the car involved, which was a wasting asset *49 rapidly decreasing in value. Finally it contends that its recent entry into the field of automobile finance, coupled with its location in a predominantly transient area, placed it in a less favorable position than that enjoyed by many of its competitors. It maintains that its officers took the foregoing factors into consideration in computing the additions to its bad debt reserve for the years in issue; and further that, when viewed in the light of these conditions, the additions made by it to its reserve for bad debts during the years in issue were reasonable. Respondent contends that petitioner's bad debt policy, and additions to its reserve, were both unreasonable and unjustified. In support of his position he argues that the loans involved all were of short duration, and were adequately secured. He further submits that the excellent conditions in the automobile business in 1952 made it easy to lend money without any risk of loss. Finally, he maintains that an analysis of petitioner's bad debt experience for the 12-year period from 1947 to 1958, reveals that its losses averaged about.232 of 1 per cent of its loans outstanding at the close of those years, and therefore that his *50 allowances for the years in issue, providing reserve balances ranging from.250 to.420 of 1 per cent of loans outstanding as of the close of the year, were clearly adequate. From the testimony of its treasurer, it appears that petitioner's policy, with respect to the annual additions to its bad debt reserve, was primarily intended to provide protection against those losses which were anticipated when the supply of automobiles caught up with the demand. In other words, it did not consider the conditions encountered in its business up through the years in issue to be a true reflection of the "type of market * * * [it] * * * would get into later * * *." However, it is well established that the purpose underlying a reserve for bad debts is not to acquire protection from excessive losses in subsequent recession years. S. W. Coe & Co., v. Dallman, 216 F.2d 566 (C.A. 7, 1954). Rather its function is to absorb those debts which might reasonably be expected to become worthless during the years in which it is created. Krim-Ko Corporation, supra.Thus, reliance by petitioner upon trends in the automobile market which might develop in the future, for the purpose *51 of computing additions to its bad debt reserve, was misplaced. The record further reveals that petitioner relied heavily upon certain statistics compiled by The First National Bank of Chicago as to "Composite Ratios - Installment Sales Finance Companies." It now maintains that the percentage of its reserve balance to its loans outstanding as of the close of 1952, was considerably less than the comparable percentage of reserves for losses to total retail receivables of automobile finance companies evidenced by those statistics. However, those statistics were admitted in evidence for the limited purpose of showing what petitioner considered in arriving at the addition to its reserve for the taxable year 1953. There was no attempt to establish the basis upon which they were compiled, nor to show a relationship between the companies alluded to therein and the petitioner. Thus, they cannot now be relied upon to establish the reasonableness of the additions to its bad debt reserves for the years in issue. In any event, the record clearly indicates to us that the additions allowed by respondent during the years 1951, 1952 and 1953, produced reserve balances more than adequate to absorb *52 losses arising from petitioner's bad debts. And this is true, whether it is viewed for the short period 1947 through 1953, or for the longer period 1947 through 1958. Therefore, we are unable to conclude that respondent's determination was either arbitrary, or represented an abuse of discretion. Accordingly, his partial disallowance of additions to petitioner's bad debt reserve for each of the years in issue are sustained. The second issue is whether the late filing of petitioner's 1953 return was due to reasonable cause. The record indicates the return was signed by petitioner's secretary on February 6, 1954, more than a month prior to its due date. However, as a result of a clerical error, both the original and duplicate copies of the return were placed in a file drawer. When the error was discovered, a check was made out and mailed with the return. As a result the return was filed on March 25, 1954, 10 days after its due date. Due consideration of the evidence presented on this issue has led us to conclude and find as a fact that the untimely filing of petitioner's 1953 return was due to reasonable cause, and not wilful neglect. Carnie-Goudie Manufacturing Co., 18 B.T.A. 893 (1930). *53 Decision will be entered under Rule 50.