Hyman-Michaels Company, an Illinois corporation v. Commissioner.
Hyman-Michaels Co. v. Commissioner
Docket No. 90401.
United States Tax Court
T.C. Memo 1963-226; 1963 Tax Ct. Memo LEXIS 117; 22 T.C.M. (CCH) 1135; T.C.M. (RIA) 63226; August 23, 1963
Sidney J. Hess, Jr., and Lewis R. Baron, First Nat'l Bank Bldg., Chicago, Ill., for the petitioner. Donald J. Forman and Donald W. Geerhart, for the respondent. MULRONEY *118 Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in the petitioner's income tax for 1951 in the amount of $213,581.38. The issue before us is whether petitioner is entitled to a net operating loss carry-back from 1952, because of a claimed loss of $443,000 in such year, either under section 23(k) of the Internal Revenue Code of 1939, which amount represents an addition in that year to petitioner's reserve for bad debts, or as a loss under section 23(f) of the Internal Revenue Code of 1939. Findings of Fact Hyman-Michaels Company, hereinafter called the petitioner, is an Illinois corporation with its principal office at Chicago, Illinois. Petitioner filed its Federal income tax returns for 1951 and 1952 with the district director of internal revenue at Chicago, Illinois. Petitioner kept its books and records and filed its Federal income tax returns on an accrual basis at all times here relevant. During the years 1951 and 1952 the officers of petitioner were Everett B. Michaels, president; Ralph Michaels, vice-president, secretary and assistant treasurer; and Frank Sheldon, treasurer; and petitioner's board of directors in *119 1951 and 1952 consisted of Everett B. Michaels and Ralph Michaels. During the years here involved Everett B. Michaels owned 344 shares of petitioner's common stock, and Ralph Michaels owned 118 shares of common stock and 170.5 shares of preferred stock. The balance of the common and preferred stock of petitioner was held by or for the benefit of the wife and children of Everett and Ralph, respectively, and members of the Michaels family. For many years the petitioner has been engaged in the business of buying and selling iron and steel products, including scrap iron, railroad equipment, abandoned railroad properties, rolling stock and construction equipment. It was a regular part of petitioner's business to rehabilitate various kinds of equipment for resale. Petitioner entered into joint ventures very frequently, and such joint ventures included the importation of heavy construction equipment for rehabilitation and ultimate resale, the demolition of abandoned railroad track, liquidation of mining properties, and various other ventures. Commerce International Company, Inc., hereinafter sometimes called Commerce, is a New York corporation with offices in New York City. The officers *120 of Commerce were Satiris G. Fassoulis, president; M. Aprahamian, vice-president; and M. A. Couvaras, secretary. As of December 28, 1950, Commerce entered into a contract with the United States Government (Department of the Army) to remanufacture and modify 581 vehicles described as Carriage Gun Motor 90 MM M36, hereinafter called tanks, for a total contract price of $2,228,533.10. The contract, hereinafter sometimes called the Government contract, consisted of two parts: Part I provided for the remanufacture of tanks at a fixed price, and Part II provided for the reimbursement at cost, plus 3 percent for overhead, for parts, materials and services. The tanks, as well as certain parts and components, were to be supplied by the Government under Part I of the contract. Under Part II of the contract Commerce, when so directed, was to acquire or manufacture for the Government's account all parts and components which the Government was unable to furnish and, under certain circumstances, Commerce was required to reclaim or have reclaimed such items. Part II provided that certain kinds of reclamation work were to be performed by Commerce without further reimbursement, while other types of *121 reclamation work were reimbursable at a price to be negotiated by the parties. Under Part I of the contract Commerce was required to furnish all the necessary labor, material, tools and equipment (except as otherwise provided) to remanufacture and modify the 581 tanks according to prescribed specifications. Commerce was required to disassemble and inspect each tank and to repair, remanufacture and modify all tanks, parts, components, accessories and attachments and to reassemble each of the tanks to combat standards. Commerce was required to deliver the rebuilt tanks to the Government over a period from April 1951 through September 1951. Upon delivery and acceptance of the tanks and presentation of properly certified invoices, the Government agreed to pay Commerce as follows: Part I
Remanufacture of 581 tanks at
$2,975.10
$1,728,533.10
Part II
Estimated total amount for re-
imbursement at cost plus a
percentage for overhead for
parts and materials for 581
tanks
500,000.00
Total
$2,228,533.10
The contract was subsequently amended at various times by 12 supplemental agreements. The first of these was dated August 13, 1951, and the final supplemental *122 agreement was dated June 16, 1954. In Supplemental Agreement No. 1, the provision for reimbursement at a negotiated price for extraordinary reclamation work was moved from Part II of the contract to Part I. Also the total contract amount was increased to $3,401.413.23 (Part I - $1,901,413.23; Part II - $1,500,000). Supplemental Agreement No. 5 (June 18, 1952) increased the total number of tanks included under the contract from 581 to 601. Generally, the supplemental agreements made changes in the type and extent of work to be performed, and adjustments were accordingly made in the total contract price so that by December 18, 1952 (Supplemental Agreement No. 7, providing that $152,727.90 be paid for changes and/or additions in requirements for export packaging of rebuilt tanks) the total contract price was $3,778,946.01. During 1953 there were four supplemental agreements and at the end of that year the total contract price had been adjusted to $3,792,422.22. The last supplemental agreement was executed in June 1954. A joint venture to perform the obligations of Commerce under the contract and to receive the benefits was formed under an agreement dated as of January 2, 1951 and executed *123 by Everett B. Michaels for petitioner, Franz Lissauer for Associated Metals & Minerals Corporation (a New York corporation hereinafter called Associated) and Satiris G. Fassoulis for Commerce. The agreement of joint venture provided in part as follows: * * *
SECOND: The Venture shall transact business under the trade name and description "C.A.M. INDUSTRIES" and shall establish its principal place of business in Philadelphia, Pa., at the Site. A certificate designating the trade name shall be filed by the parties hereto as required by law. THIRD: Fassoulis shall actively supervise and be responsible for the performance of the Award and Contract, and shall perform his duties hereunder in accordance with the limitations and controls established hereby. * * *
FIFTH: Michaels and Lissauer and each shall lend the Venture, as soon as this agreement becomes finally effective, the sum of One hundred fifty thousand Dollars ($150,000.00) to be used as working capital for the Venture. Prior to said final effective date, Michaels and Lissauer shall each advance for the purposes of the Venture so much of said One hundred fifty thousand Dollars ($150,000.00) as they may deem necessary *124 for the purposes of the Venture (in which event the balance shall be paid over upon said final effective date). Repayment shall be made at the option of Lissauer and Michaels at such time or times as such repayment will not reduce the liquid working funds of the venture below One hundred fifty thousand Dollars ($150,000.00). If said sums shall be fully repaid to Michaels and Lissauer, respectively on or before December 31, 1951, no interest shall be paid thereon or on any part thereof; but if said sums shall not be fully repaid by said date, then such amounts as, from time to time, remain unpaid shall bear interest at the rate of four per cent (4%) per annum from and after the dates of the respective loans. If any part of said sums shall be advanced prior to the date this agreement becomes finally effective and if, for any reason, this agreement shall not become finally effective, repayment thereof shall be governed by Section FIRST hereof. SIXTH: For the purpose of this Section SIXTH only, and for no other purpose, the contribution of Fassoulis shall be deemed to be Three hundred thousand Dollars ($300,000.00) as of the date this agreement becomes finally effective and the contributions *125 of the parties shall be Fassoulis
Three hundred thousand Dol-
lars ($300,000.00) (theoretically);
Michaels
One hundred fifty thousand
Dollars ($150,000.00);
Lissauer
One hundred fifty thousand
Dollars ($150,000.00);
Whenever any two of the parties hereto shall determine that cash working funds of the Venture are insufficient for the proper conduct of its affairs, the parties hereto shall advance additional funds to the Venture in the following proportions: Fassoulis
Fitty per cent (50%);
Michaels
Twenty-five per cent (25%);
Lissauer
Twenty-five per cent (25%);
In the event any party hereto shall fail to advance to the Venture the sum prescribed for payment by him hereunder within seven (7) days after the parties shall have agreed that additional funds are required as aforesaid, and should the other parties advance to the Venture the sum prescribed to be advanced by the one so failing, the respective shares of the profits of the parties shall be accordingly increased and decreased so that the profit participation of each shall then be in proportion to the total amount contributed or deemed to have been contributed by each. Nothing *126 herein contained shall effect the obligations of the parties to bear losses in the proportions hereinafter provided. * * *
THIRTEENTH: The profit or loss of the Venture shall be determined by the Accountants at the conclusion of each calendar year hereafter, when the Contract has been fully performed and at such other time or times as the parties hereto shall determine. Such profit or loss shall be determined by the Accountants in accordance with standard accounting practice and the principles established by them for the maintenance of the accounts of the Venture. Any profit so determined shall be credited to the accounts of the parties hereto in the following manner: (A) Ten per cent (10%) of the profit so determined shall be credited to Fassoulis or the said Aprahamian, as the case may be, so long as they shall continue to perform the duties imposed upon them by Section THIRD hereof. However, any and all amounts so credited shall be subject to be charged with any subsequent losses to the extent of ten per cent (10%) thereof. In the event payment shall have been made of any amount so credited and there shall be subsequent losses, Fassoulis and/or the said Aprahamian, as *127 the case may be, shall reimburse the Venture to the extent of 10% thereof. In the event a successor, other than Aprahamian, to Fassoulis shall be appointed pursuant to said Section, the parties hereto shall determine whether any portion of the profits shall be paid to such person pursuant hereto for said services. (B) The remaining ninety per cent (90%) of the profit, or such profit as shall not be credited pursuant to Paragraph (A) in the event that Fassoulis shall not be entitled to the amount prescribed by said paragraph, shall be credited to the parties hereto (or their successors in interest) as follows: To Fassoulis
Fifty Per Cent (50%)
To Michaels
Twenty-Five Per Cent
(25%)
To Lissauer
Twenty-Five Per Cent
(25%) provided, however, that, in the event that the profit participation of the parties hereto shall be modified in accordance with the provisions of Section SIXTH hereof, then distribution of said profits pursuant to this Paragraph (B) shall be in the proportions established by said modifications. Any losses suffered or incurred in the performance of the Venture shall be borne by the parties hereto and charged to their accounts in the following *128 proportions: Fassoulis
Fifty Per Cent (50%)
Michaels
Twenty-Five Per Cent (25%)
Lissauer
Twenty-Five Per Cent (25%)
The profit of the Venture shall be distributed to the parties hereto at such time or times as the parties shall mutually agree, provided, however, that no distribution of profit shall be made until such time as all advances and loans by the respective parties to the Venture and all interests thereon, if any, shall be fully paid. FOURTEENTH: Upon the termination or dissolution of the Venture by lapse of time or otherwise, and after a full and complete account shall have been prepared by the Accountants, the net assets of the Venture shall be distributed in the order hereinafter prescribed. (A) To the payment of all debts and liabilities of the Venture and expenses of liquidation, excluding any indebtedness to the parties hereto or their respective successors in interest. (B) To the payment to Michaels and Lissauer of their initial loans in the amounts of One Hundred Fifty Thousand Dollars ($150,000.00) each. (C) To the payment to the parties hereto of all additional loans and advances by them, respectively, to the Venture. (D) To the payment *129 to the parties hereto of all accrued and unpaid interest due them, respectively, on loans by them to the Venture. (E) To the payment to the parties hereto of any profit from the Venture which shall not have been withdrawn by the parties hereto. (F) To the division among the parties hereto of the surplus of assets remaining, in the proportions in which they then participate in the profit of the Venture. If the assets available shall be sufficient to make payment in part of one of the classes (A) to (E) inclusive but shall be insufficient to pay any such class in full, distribution shall be made pro-rata on account of the sum due each person in said class. Nothing herein shall be construed to release the parties hereto from liability in the proportion in which they bear losses of the Venture for the repayment in full to the parties hereto of their respective loans to the Venture. The joint venture, which is described in the agreement as C.A.M. Industries, will hereinafter sometimes be called CAM. Partnership returns were filed by CAM for its fiscal years ended October 31, 1951 and 1952 with the district director of internal revenue, Philadelphia, Pennsylvania, and for its fiscal *130 years ended October 31, 1953 through 1961 with the district director of internal revenue, New York City, New York. CAM entered into a lease agreement as of February 1, 1951 with American & Foreign Warehouse Company, Inc. for the use of 70,000 square feet of space in a building located at the Cramp Shipyard at Philadelphia, Pennsylvania, for a one-year period ending January 31, 1952 at $100,000 per annum, payable quarterly, and with an option to renew from year to year for three years. CAM elected to exercise its option on December 28, 1951 to renew the lease for the period from February 1, 1952 to January 31, 1953. CAM encountered difficulties in performing its work under the Government contract, which difficulties CAM attributed to the Government's failure to supply CAM with the necessary parts to rebuild and modify the tanks. Parts were difficult to obtain commercially. CAM's operations, in spite of the difficulties, continued and large sums of money were required to maintain operations. In its first fiscal year ending October 31, 1951, CAM incurred costs of $1,945,740.78, and of this total amount the payroll costs were $1,290,055.39. The total cost of CAM's plant and equipment, *131 including leasehold improvements as of October 31, 1951, was about $220,000. About December 1951 the Government notified CAM to suspend its operations because of shortages of critical parts, and sometime in February 1952 notified CAM to resume its work. CAM resumed operations about the middle of March 1952 and completed its work of rehabilitating the tanks under the Government contract in September 1952. Petitioner issued its check dated January 26, 1951 to the order of CAM in the amount of $150,000, which amount was credited on January 31, 1951 in the CAM ledger in an account (No. 1183) entitled "Capital Account - Everett Michaels for Hyman Michaels Company." No further entries were made in the account in 1951 and 1952. A ledger account (No. 1182) in the CAM books and records entitled "Capital Account - Herman Lissauer for Associated Metals & Minerals" shows a credit in the amount of $150,000 under date of January 31, 1951. No further entries appear in this ledger account in 1951 and 1952. During the years 1951 and 1952 the advances made by petitioner to CAM were channeled through Associated, and any repayments made by CAM to petitioner were similarly channeled through Associated. *132 Beginning in May 1951 and ending in September 1952 petitioner issued 43 checks for this purpose in amounts ranging from $4,000 to $70,000 and received repayments or credits at various times through Associated. By September 1952 the outstanding balance of these advances (taking into account not only the credits and repayments but also the amount of $228,332.75, which represented petitioner's distributive share of CAM's losses for CAM's fiscal year ended October 31, 1951) was $841,218.58. These advances by petitioner, together with matching advances by Associated, were cleared on CAM's books through its ledger account No. 1114 and entitled "Loans Payable". Until the end of 1952 this account recorded these advances only in Associated's name. A summary of the entries in CAM's account No. 1114 for the fiscal years ended October 31, 1951 and 1952 is as follows: Fiscal Year ending 10/31/51 Advances: Associated
$650,000
Commerce
30,000
$ 680,000.00
Repayments: Associated
$148,000
Commerce
30,000
178,000.00
Net balance of advances during
Fiscal Year
$ 502,000.00
Fiscal Year ending 10/31/52
Advances: Associated
$1,924,436.00
Less repayments or adjustments
to Associated
287,333.34
Net balance of advances during
Fiscal Year
$1,637,102.66
*133 The net balance in CAM's account No. 1114 on December 31, 1952 was $2,139,102.66 ($502,000 plus $1,637,102.66). CAM's ledger account No. 1150 entitled "Commerce Co. - Loan Account" shows the advances by Commerce to CAM and the repayments by CAM to Commerce during the fiscal years ended October 31, 1951 and 1952. The net balances of advances in the account as of October 31, 1951 and 1952 were $80,700 and $334,933.34, respectively. Petitioner recorded its advances to Associated for the account of CAM in its ledger account No. 42.7, which is entitled on page 1 as "C.A.M. INDUSTRIES JT.V. INVESTMENT A/C". On page 2 of the ledger account the title, as quoted in the preceding sentence, is crossed out and in its place is substituted "ADVANCES TO C.A.M. INDUSTRIES". The first entry in this account records petitioner's initial advance of January 26, 1951 to CAM in the amount of $150,000. Subsequent advances made by petitioner during the fiscal years ended October 31, 1951 and 1952 are generally described as "ADDITIONAL INVESTMENT ACCOUNT C.A.M. INDUSTRIES" and occasionally as "ADVANCE INVESTMENT IN CAM INDUSTRIES", or "ADDITIONAL CAPITAL CONTRIBUTION TO - C.A.M. INDUSTRIES". The net balances *134 in account No. 42.7 on October 31, 1951 and 1952 were $401,000 and $991,218.58, respectively. On July 6, 1951, Commerce executed an assignment to The Chase National Bank of the City of New York (hereinafter called Chase) which provided that in the event any loans were made by Chase to Commerce, all amounts due or becoming due to Commerce under the Government contract were assigned to Chase as security for the repayment of such loans. On August 13, 1951 the petitioner, Commerce and Associated, as coventurers in CAM, executed an agreement guaranteeing loans to be made by Chase to Commerce. The guarantee stated that it was deemed to be the obligation of CAM as a separate entity and would not impose any "individual liability" on petitioner or Associated. The guarantee provided that petitioner and Associated would "not, until such loans made by [Chase] to [Commerce] shall have been fully repaid * * *, withdraw from the joint venture the whole or any part of the sum of $150,000.00 originally contributed by each of them to the working capital of the joint venture, or any profits accruing thereon (nothing herein contained shall be deemed to apply to temporary advances which [petitioner *135 and Associated] have made or may make to said venture)." Chase made a series of loans to Commerce from August 14, 1951 to February 25, 1952 and from time to time Commerce made repayments on such loans. During most of this period the balance of loans outstanding to Commerce ranged between $200,000 and $300,000 and on occasion exceeded this amount. By May 5, 1952 the outstanding loan balance was repaid in full by Commerce. About August or September 1951 Commerce found it was unable to continue its advances to CAM. On October 18, 1951, petitioner entered into an agreement with Commerce International China, Inc. (a Delaware corporation hereinafter sometimes called China), Fassoulis and Aprahamian under which China sold to petitioner certain equipment located at Cramp Shipyard, Philadelphia, Pennsylvania, for $300,000. China, Fassoulis and Aprahamian represented that the equipment had a resale value in excess of $300,000, and the agreement provided that "[when] all the equipment has been sold by [petitioner] it shall pay to [China], as additional purchase price, an amount equal to fifty per cent * * * of the net sale price received by [petitioner] in excess of Three Hundred *136 Thousand Dollars ($300,000)." At the time this agreement was made it was also agreed to by the parties that $253,333.33 would be redistributed to petitioner and Associated, with one-half of this amount going to each party. By letter dated February 13, 1952, Associated notified CAM as follows: Gentlemen: Re: Loan Accounts You received copy of the letter Mr. Sheldon [petitioner's treasurer] wrote to the undersigned on February 8th and should like to confirm on our part that all the advances made by Associated Metals & Minerals Corporation are joint advances to be credited one half to Hyman-Michaels Company and one half to Associated. We would ask you to adjust C.A.M. Industries' records accordingly. As requested by Mr. Sheldon, when making advances in future, we shall always inform you to the effect that such advances have to be credited one half to Hyman-Michaels Co. and one half to Associated. Associated also advised CAM that the status of the partners' accounts as set out in Sheldon's letter of February 8 did not agree with Associated's records, and that according to the books of Associated, the "Loans as at February 7, 1952" were $317,901.33 for Associated and $317,901.33 *137 for petitioner. By letter dated February 14, 1952, Commerce notified petitioner (and sent a copy of the letter to CAM and to Associated) that Commerce disagreed with the partnership accounts as stated in Sheldon's letter of February 8 and that the correct breakdown was as follows: Loans
Associated
H.M.
C.I.C.
Total
At 10/31/51
$124,333.33
$124,333.33
$334,033.34
$ 582,700.00
Nov.
93,568.00
93,568.00
187,136.00
Dec.
30,000.00
30,000.00
60,000.00
Jan.
67,000.00
67,000.00
134,000.00
To Feb. 14
20,000.00
20,000.00
7,000.00
46,000.00
$334,901.33
$334,901.33
$341,033.34
$1,010,836.00
Capital
150,000.00
150,000.00
300,000.00
$484,901.33
$484,901.33
$341,033.34
$1,310,836.00
By letter dated February 19, 1952, CAM notified Associated (and sent a copy of the letter to petitioner and Commerce) that, after certain adjustments on CAM's books, CAM was in agreement with the breakdown of the partners' accounts as stated in the letters of Associated (February 13) and Commerce (February 14). Late in 1951 CAM submitted to the Government its claim for reimbursement for extraordinary reclamations costs in connection with *138 the first 261 tanks. CAM's claim listed some 80 operations. These were called "shop work orders", a term used to describe reimbursable operations involving reclamation work of an extraordinary nature. In December 1951 a Colonel Ghormley approved 65 of these and on the basis of this approval CAM resubmitted an invoice covering reimbursable costs for extraordinary reclamations on the 261 tanks amounting to $1,325.27 per tank, or a total of $345,895.47. No final action was taken by the Government on this claim. It developed that the Government required more detailed substantiation of these costs before it would make payment in the amounts claimed by CAM. Negotiations continued on this matter into 1952, and while the shop work order negotiations on the 261 vehicles were continuing, CAM revamped its accounting staff in order to keep detailed cost figures for its extraordinary reclamation work on the remaining 340 tanks. The negotiations in 1952 reached no satisfactory conclusion and in December 1952 CAM retained a law firm in New York City to prosecute the so-called shop work orders claim against the Government, as well as a breach of contract claim against the Government. As a result *139 of conferences with the coventurers in December 1952, the member of the law firm who was to handle the claims decided that the matter had been improperly handled by CAM; that the decisions by the Government denying reimbursement of extraordinary costs had been denied on the ground that they were not properly substantiated; and that the success of the claim would depend on a proper substantiation of the costs for which reimbursement was being sought. The law firm, with the assistance of CAM accounting and clerical personnel, proceeded to assemble the necessary cost figures, and by April 1953, the law firm decided that a "good part" of the claim could be submitted on the basis of actual cost. On September 15, 1953, CAM submitted to the Government claims for reimbursement for extra work and extraordinary reclamation under the contract as follows: 1. First phase of operations (261 tanks)
A. Shop work orders "for which price has been established"
$ 345,895.47
B. Shop work orders "for which no price has been established"
166,853.84
2. Second phase of operations (340 tanks)
Shop work orders "for which no price has been established"
755,246.18
3. Shop work orders "not presently substantiated by individual em-
ployee time records"
175,000.00
$1,442,995.49
Less amounts invoiced during 1951
10,097.78
Total
$1,432,897.71
*140 The shop work order claims were finally settled in June 1954 for the total amount of $513,008.75. In "Supplemental Agreement No. 12" under date of June 16, 1954, which reflected this settlement, it is stated, in part, as follows: 1. Contract No. DA-36-034-ORD-75, as amended, is further amended as follows: Upon execution of this Supplemental Agreement the Government agrees to pay to the Contractor, upon presentation of properly certified invoice or voucher, the sum of Five Hundred Thirteen Thousand, Eight Dollars and Seventy-five Cents (513,008.75) as payment in full and complete settlement of the amount due the Contractor by reason of extra work and extraordinary reclamation performed over and above the requirements of the contract, the details of which are stated in the Contractor's claim for adjustment dated 15 September 1953, plus amendments and exhibits thereto subsequently submitted by the Contractor, the context of which are included herewith and made a part hereof by reference. * * *
3. The Part I price of the contract is hereby increased by Five Hundred Thirteen Thousand, Eight Dollars and Seventy-five Cents ($513,008.75) from Two Million, Two Hundred Twenty-seven *141 Thousand, Five Hundred Fifty-one Dollars and Twenty-five Cents ($2,227,551.25) to Two Million, Seven Hundred Forty Thousand, Five Hundred Sixty ($2,740,560.00) Dollars by reason of this Supplemental Agreement. * * *
On December 9, 1953, Commerce authorized Chase to pay all sums received by it under the July 6, 1951 assignment of all money due and to become due under the Government contract, 50 percent to petitioner and 50 percent to Associated. Accordingly, Chase made available to petitioner the amount of $256,504.37 on July 1, 1954. Petitioner entered this amount as a credit in its ledger Account No. 42.7 (recording the petitioner's advances to CAM), which created a credit balance in the amount of $251,155.78. On July 18, 1955, a petition was filed in the United States Court of Claims by Commerce against the United States claiming damages of $1,800,000 for breach of contract. Commerce, as a basis for its claim, alleged that the Government failed to perform its obligations under the 1950 contract to furnish Commerce with parts, materials, plans and specifications necessary to perform the work under the contract. As of December 17, 1962, the action was still pending before *142 the Court of Claims. CAM reported its income or (loss) from the Government contract under the percentage of completion method. CAM reported the following amounts of income or (loss) on its partnership returns filed for the fiscal years ending October 31, 1951 through 1961: Fiscal Year
Ending Oc-
Income or
tober 31
(Loss)
1951
[ 922,331.01)
1952
(1,742,766.70)
1953
( 50,000.00) *
1954
487,417.65
1955
( 27,026.53) **
1956
( 3,487.62) **
1957
827.75
1958
( 45,114.18)
1959
( 61,015.61) **
1960
( 160,459.76) **
1961
( 29,162.19) **
Petitioner's books and records were audited early in 1953 with respect to its 1952 financial statements by the same certified public accountants who had done such work for petitioner for many years. Sometime in the course of the audit (about February 1953) the amount of $451,042.33 was removed from the petitioner's CAM investment account (Account No. 42.7) and reclassified as a loan receivable from Commerce in petitioner's new Account No. 21.3. As of December 31, 1952 a credit of $40,532.54 (representing a purported settlement with *143 Commerce in connection with another venture) was made in Account No. 21.3, reducing the balance as of that date to $410,509.79. Under date of May 22, 1953 a demand promissory note of Commerce was issued payable to petitioner in the amount of $413,159.80. A chattel mortgage was executed by Commerce under date of December 27, 1954 as security for a purported indebtedness of $600,000, one-half of which was purportedly owed to petitioner and one-half to Associated. Petitioner neither accrued nor received interest income from CAM and/or Commerce during the years 1951 through 1961. Petitioner used the reserve method of accounting for its doubtful or uncollectible debts, notes or accounts. As stated on its income tax returns, petitioner's accounts and notes receivable and sales for the years 1950 through 1953 were as follows: Accounts and Notes
Year
Receivable
Sales
1950
$3,663,908.56
$16,913,247
1951
2,463,045.18
22,784,592
1952
2,411,406.96
19,679,836
1953
1,794,706.60
17,899,663
During the years 1946 through 1951 petitioner made a total annual provision (credit) of $6,000 in its reserve for bad debts account. This was accomplished through monthly *144 credits of $500. Specific write-offs of uncollectible accounts appear as debits in the reserve account These monthly $500 credits to the reserve account were continued throughout 1952. In 1953, after the February credit of $500 in the reserve account, a credit entry of $425,000 appears in the reserve account, dated as of December 31, 1952 and described as additional provision for 1952. A stipulated schedule of the reserve for bad debts account shows the following: Balance at Be-
Charge-offs during
ginning of
year - Notes and
Balance - End
Year
Year
Acc. Rec.
Net Provision
of Year
1950
$ 55,780.87
$ 253.83
$ 6,000.00
$ 62,503.29
1951
62,503.29
635.39
6,000.00
68,121.29
1952
68,121.29
11,241.06
431,000.00
487,894.18
1953
487,894.18
120.47
22,821.47
511,995.18
On December 31, 1956, petitioner charged-off in its reserve account, among other items, the amounts of $10,893.63 and $305,034.28 as uncollectible items from Commerce; petitioner also charged-off under the same date the amount of $23,408.51, purporting to be an uncollectible item from Commerce International China. Petitioner's corporation income tax return for 1951 *145 showed a net income of $612,619.24. (Total income, $2,222,932.83 and total deductions, $1,610,313.59). Petitioner reported in its 1951 return its share of the CAM loss for the fiscal year ended October 31, 1951 in the amount of $228,332.75. Petitioner's balance sheet attached to the 1951 return shows "Investments in Joint Ventures" in the amount of $519,510.44 as or December 31, 1951. Petitioner's 1952 corporate return showed a net operating loss of $548,988.03, which included petitioner's share of its CAM losses for the fiscal year ended October 31, 1952 in the amount of $437,941.68. (The partnership return filed by CAM for the fiscal year 1952 shows petitioner's share of the loss as $435,691.68). Petitioner's balance sheet attached to the corporate return shows "Investment in Joint Ventures" as of December 31, 1952 as $541,387.15. Petitioner claimed the 1952 loss as a net operating loss carry-back to 1951 and, pursuant to its application for a tentative carry-back adjustment, obtained a refund of $264,760.73 for 1951. Petitioner's corporate return for 1952 shows in Schedule F (Bad Debts) the amount of $443,000 as added to reserve in 1952, and this amount was claimed as a deduction *146 for that year. Respondent disallowed this deduction with the following explanation: (f) It has been determined that your addition to the bad debt reserve in 1952 in the amount of $443,000.00 was excessive and is not allowable under section 23(f), (g) or (k), 117(d), or any other section of the Internal Revenue Code of 1939. It has been determined that, as a result of the above adjustment, your net operating loss carry-back from 1952 to 1951 was overstated in the same amount, $443,000.00, and that such deduction in 1951 is not allowable under section 122 or any other section of the Internal Revenue Code of 1939. Opinion Petitioner's major argument is that the amounts advanced by it to CAM during the years 1951 and 1952 were, after its initial advance to CAM of $150,000, really loans to Commerce (to the extent of approximately one-half of such advances); that on December 31, 1952 the balance of this indebtedness to petitioner was $410,509.79 ($451,042.33 minus an offset of $40,532.54); and that as of that date the petitioner reasonably determined that the indebtedness was uncollectible and made provision for it, as well as accounts receivable from other persons, by the addition *147 to the reserve for bad debts. Petitioner also makes several alternative arguments. Petitioner's first alternative argument is that if this Court should hold that "said sums were not loaned by the petitioner to Commerce, that said amount must be regarded as sums loaned by the petitioner to CAM under said Section Sixth [of the joint Venture agreement] and that CAM at December 31, 1952, was indebted to the petitioner therefor," and that petitioner was justified in providing for the doubtful collectibility of such indebtedness by the addition to its reserve for bad debts account in 1952. Petitioner's second alternative argument can best be stated in this manner: (1) under the joint venture agreement Commerce was to bear 50 percent of the losses of the venture; (2) if the advances of petitioner to CAM in 1951 and 1952 were all capital contributions to CAM, then, under the facts, Commerce failed to contribute its share of the CAM losses by some $997,615.51; (3) Commerce, therefore, was indebted to CAM in the amount of this delinquency, and this in turn represented a debt of Commerce to petitioner (as joint venturer) of one-half of this amount, or $498,807.76; and (4) the petitioner *148 properly made provision for the uncollectibility of this debt as of December 31, 1952. Petitioner's third alternative argument is that if the advances made by it to CAM were capital contributions, then petitioner is entitled to a deduction of $498,807.76 in 1952 as a loss sustained under section 23 (f) of the Internal Revenue Code of 1939. [1]
Petitioner has the burden to prove that it is entitled to the claimed deduction. Petitioner's major contention, as well as its first and second alternative arguments, are keyed to section 23(k)(1), which provides that in computing net income there shall be allowed as deductions "[debts] which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts." To prevail, petitioner must prove (1) that a creditor-debtor relationship existed (either with Commerce or with CAM) and (2) that the addition of $443,000 to its reserve for bad debts account in 1952 was reasonable *149 within the meaning of the statute. Whether or not the parties here intended a creditor-debtor relationship or something else is a question of fact. See O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, affirming a Memorandum Opinion of this Court; Max Thomas Davis, 46 B.T.A. 663. We cannot find that the advances made by petitioner to CAM in 1951 and 1952 were intended as loans to Commerce or to CAM. Instead, the record convinces us that the advances were petitioner's capital contributions to the joint venture. It is clear that petitioner made the advances to CAM under paragraph Sixth of the joint venture agreement. This paragraph provided that after the initial contribution by the joint venturers, whenever it was determined by any two of the parties "that cash working funds of the Venture are insufficient for the proper conduct of its affairs" the parties would advance additional funds to the joint venture in these proportions: Commerce, 50 percent; petitioner, 25 percent; and Associated, 25 percent. Paragraph Sixth then goes on to state that if any party failed to advance its share and another one of the parties made up the missing share, *150 then "the respective shares of the profits of the parties shall be accordingly increased and decreased so that the profit participation of each shall then be in proportion to the total amount contributed or deemed to have been contributed by each. Nothing herein contained shall effect the obligations of the parties to bear losses in the proportions hereinafter provided." Since Commerce soon proved unable to meet its share of the joint venture's additional working funds that were needed, it was necessary for petitioner and Associated to meet this need alone. This was the very situation contemplated by paragraph Sixth of the joint venture agreement, and under its explicit provisions the petitioner and Associated would be entitled to an increased share of the profits because of their added contributions. To argue, as petitioner does, that portions of these advances were really loans to Commerce to enable Commerce to meet its share of the additional advances needed by the venture, is to completely ignore the agreement of the parties. Throughout 1951 and 1952 petitioner itself seemed to regard these advances to CAM as investments rather than loans. In the petitioner's ledger account (No. *151 42.7) where these advances were recorded, they were repeatedly identified as "Additional Investments." Moreover, the account is called, on the first page, "C.A.M. INDUSTRIES JT.V. INVESTMENT A/C" and on subsequent pages is headed "ADVANCES to C.A.M. INDUSTRIES." The advances to CAM, subsequent to the initial contribution, were all recorded in this account throughout 1951 and 1952, and it was not until early in 1953 that petitioner transferred the amount of $451,042.33 out of this account into a newly created Commerce loan account. It is difficult to disassociate this rather tardy recasting of the transactions of the prior two years from the evident tax benefits which would flow from such a move. Moreover, the actions of the other parties bolster a finding that these advances to CAM were not intended as loans. There is no persuasive evidence in the record that Commerce, the purported debtor, was aware of the fact that about one-half of the advances by petitioner to CAM in 1951 and 1952 were loans to Commerce. On the contrary, the evidence shows that Commerce, petitioner and Associated, early in 1952, worked out some discrepancies in the amounts of their partnership accounts as they *152 were reflected on the respective sets of books, and it is clear from correspondence in evidence that Commerce understood that the advances which petitioner had been making to CAM were attributable solely to petitioner's partnership and did not purport to come from Commerce to any extent. We have also considered other factors which are significant in showing the lack of any intention to create a creditor-debtor relationship. No promissory notes were received by petitioner in 1951 or 1952 from Commerce (or from CAM) to indicate that loans were in fact intended. Petitioner never received or accrued any interest in connection with the amounts it advanced to CAM. Finally, it appears that the contract to rebuild the 601 tanks was what the parties called a "labor" contract, that is, a major portion of the costs in performing the job would be current payable costs. In CAM's first fiscal year ended October 31, 1951 its payroll cost was $1,290,055.39 out of total costs of about $2,000,000. It is evident that the advances to CAM by petitioner and Associated provided essential working capital. It was only when CAM was recompensed by the Government for its work under the contract that petitioner *153 and the other joint ventures could expect to be recompensed. Clearly, repayment to petitioner depended on the outcome of the venture and not on any purported creditordebtor relationship. We find, on the basis of the entire record, that the advances by petitioner to CAM in 1951 and 1952 were not intended as loans either to Commerce or to CAM and that no debts to petitioner were created as a result of such advances. Even if we should assume that petitioner had loaned these amounts to Commerce or to CAM and that a debt did exist as of December 31, 1952, petitioner must still show that the $443,000 was a reasonable addition to its reserve for bad debts in 1952. [2] Under the reserve method of accounting for bad debts the reserve is increased by crediting it with additions that are reasonable under the statute, and reduced by charging against it specific debts which become worthless during the taxable year. Guidelines have been developed to determine the adequateness of a reserve, geared to annual sales, or outstanding accounts receivable on hand, past loss history and other criteria. In Roanoke Vending Exchange, Inc., 40 T.C. , (filed July 17, 1963), we stated: Respondent's determination *154 with respect to additions to reserve for bad debts carries a great deal of weight because of the discretion vested in him under section 166(c) of the 1954 Code and, accordingly, the burden of proof on a taxpayer regarding the respondent's determinations is greater than the usual burden which faces the taxpayer who seeks to overcome the presumption of correctness which attaches to respondent's ordinary notice of deficiency. Krim-Ko Corp., 16 T.C. 31 (1951); Platt Trailer Co., Inc., 23 T.C. 1065 (1955). Thus, the petitioner must not only demonstrate that its additions to the reserve were reasonable, but, also that respondent's action in disallowing those additions for the years in question were arbitrary, and amounted to an abuse of his discretion. Krim-Ko Corp., supra; Maverick-Clarke Litho Co. v. Commissioner, 11 T.C. 1087 (1948), affd., 180 F. 2d 587. *155 We cannot say that petitioner has met this burden. If we regard the petitioner's advances (in part) as loans to Commerce, we find no satisfactory evidence in the record to show that Commerce was unable or unwilling to meet its obligation. Much of the evidence as to Commerce's purported insolvency in 1952 comes from the testimony of petitioner's president. This evidence is sketchy, vague and completely unsatisfactory. It is not corroborated. The financial condition and net worth of Commerce at the end of 1952 is, under this record, a matter of conjecture. It appears in a stipulated exhibit that Commerce made advances to CAM in 1953 of about $80,000, which certainly is inconsistent with any allegations of its insolvency or inability to pay its debts at the end of 1952. There are indications in the record that Fassoulis, who controlled Commerce, also controlled other business entities. Petitioner's president indicated that he believed Commerce would have access to these other funds for use in the CAM ventures. We know nothing of the financial condition of these other activities. If, on the other hand, we regard the petitioner's advances (in part) as loans to CAM, we still cannot *156 find any satisfactory evidence as to the uncollectibility of such loans at the end of 1952. In December 1952 CAM was pursuing, through its legal representative, claims against the Government under the contract. One claim (the work shop orders) was finally settled in June 1954 for $513,008.75. [3] As to the other claim for breach of contract in the amount of $1,800,000, it was finally brought into the Court of Claims in 1955, and the case was still pending at the time of this trial. We do not feel that the record supports petitioner's contention that CAM, at the end of 1952, was not in a position to eventually meet its obligations to the joint venturers. The two remaining alternative arguments asserted, rather summarily, by petitioner are answered by our observations in the preceding paragraph. One such alternative argument is that petitioner's advances to CAM, if regarded as investments, were worthless in 1952 and that petitioner is entitled to a loss deduction *157 under section 23(f). The other alternative argument is that, in some manner, Commerce became indebted to petitioner in the amount of $498,807.76 as a result of Commerce's failure to pay its share of the losses of CAM. Both arguments are bottomed on the alleged worthlessness of the investments made in the joint venture as of the end of 1952 and the losses suffered as a consequence. However, a taxpayer must point to a closed transaction in a taxable year in order to obtain a tax loss under section 23(e) or (f). It is obvious from this record that, as of December 1952, the affairs of CAM were far from closed so as to indicate that only losses were incurred. A portion of petitioner's addition to the reserve for bad debts account of $443,000 in 1952 is based upon the alleged uncollectibility of a debt of $23,409.52 from Commerce International China, Inc. Not only are we uncertain as to existence of this particular obligation, but there is no evidence in the record that has any bearing upon the uncollectibility of this purported debt as of the end of 1952. Petitioner has not sustained its burden as to this particular item. We hold, on the basis of this record, that petitioner is not *158 entitled to a deduction of $443,000 in 1952 (or any lesser amount) either as an addition to its reserve for bad debts or as a loss sustained in that year within the meaning of the statute. Decision will be entered for the respondent. Footnotes
*. Approximately. ↩
**. No gross income or other income appears in the returns.↩
1. All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise stated.↩
2. A stipulated exhibit shows that for six years prior to 1952 the petitioner made an annual provision of $6,000 in its reserve account and that in 1952 the net provision was $431,000. The balance in the reserve account jumped from $68,121.29 in 1951 to $487,894.18 in 1952.↩
3. It appears from the record that it was chiefly petitioner's failure to properly substantiate its costs under one of the sections of the contract that led to resistance of the work shop order claimed by the Government.↩