KRIM-KO CORPORATION, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20394.   Promulgated January 11, 1951.

Chester J. McGuire, Esq., and E. T. Simpson, Esq., for the petitioner.

Wm. Schwerdtfeger, Esq., for the respondent.

OPINION.

RAUM, *Judge:* 1. Respondent disallowed deductions in the amounts of $4,400 for 1942 and $3,000 for 1944 taken by Krim-Ko as additions

to its reserve for bad debts. Ordinarily, deductions based upon reserves are not allowed under the revenue laws (cf. *Brown* v. *Helvering*, 291 U. S. 193), and this was true originally as to bad debts. Section 23(k)(1) of the Internal Revenue Code represents an exception to the general rule; it allows as a deduction "(in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts * * *."[1] However, Congress was unwilling to give the taxpayer an absolute right to such deduction and explicitly made it contingent upon the Commissioner's discretion. The question for decision here is whether there has been an abuse of that discretion. As was stated in *C. P. Ford & Co.*, 28 B. T. A. 156, 158–159:

A taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions to a reserve, he subjects himself to the reasonable discretion of the Commissioner. Reserves of any sort are not ordinarily deductible, * * * and when Congress so far departs from the customary practice as to permit such a deduction as to a bad debt reserve, the condition is as important as the permission. Such a deduction presents substantial problems of administration, and it can not be assumed that Congress intended either that the taxpayer's unrestrained judgment as to the propriety or wisdom of his method or that the Board's judgment in a particular case when not supported by broad administrative considerations as well as the taxpayer's individual premises should override the Commissioner's sound discretion. * * *

See also *Walter H. Goodrich & Co.*, 40 B. T. A. 960, 961–962.

Petitioner stresses the fact that the effect of the Commissioner's disallowance of the addition to the reserve for 1942 and 1944 is to permit for the 3 years, 1942–1944, inclusive, an addition to the reserve of only $343.23, the amount by which the reserve was increased in 1943. It suggests that such amount is wholly insufficient, based upon its experience. But the crux of the matter is not whether the additions to the reserve are sufficient to absorb the bad debts that might arise during the years involved. Rather, the question is whether the reserve itself was sufficient for that purpose. And if the Commissioner was justified in concluding, in the light of prevailing conditions, that the reserve already on the taxpayer's books was adequate, we cannot overturn his exercise of discretion to disallow further additions to the reserve.

The evidence does not convince us that respondent's action in disallowing the contested deductions was either arbitrary or an abuse of the discretion vested in him by Congress. At the beginning of the year 1941, the balance in Krim-Ko's reserve for bad debts was $12,480.03. Its actual bad debts charged to the reserve during that

---

[1] The pertinent statutory language first appeared in section 234 (a) (5) of the Revenue Act of 1921. Prior thereto, the deduction for bad debts was allowed only if the debts were ascertained to be worthless and charged off within the taxable year. See, e. g., section 234 (a) (5) of the Revenue Act of 1918.

year exceeded recoveries by $6,072.77, and $7,566.45 was added to the reserve. The balance in the reserve at the end of 1941 was $13,973.71. In 1942, although its sales increased by approximately $100,000 over 1941, there was a decrease in its accounts receivable of approximately $30,000 and a decrease in the amount of its actual bad debts over recoveries of $876.30 ($6,072.77 minus $5,196.47). Respondent's disallowance of any addition to Krim-Ko's reserve at the end of 1942 left it with a reserve of $8,777.24. This amount is some $2,700 in excess of the net charges to the reserve in 1941 and some $3,500 in excess of the net charges made thereto in 1942. This fact, and the absence of any evidence to indicate that Krim-Ko could reasonably anticipate a substantial increase in the amount of bad debts during the year 1943, seems to us to sustain respondent's determination that Krim-Ko was not entitled to any increase in the amount of its reserve for bad debts at the end of 1942.

The justification for respondent's disallowance of the $3,000 addition to Krim-Ko's reserve at the end of the year 1944 is even more clearly apparent. Without any addition, the reserve at that time was $6,607.98, whereas net charges to the reserve amounted to only $1,934.41 in 1944 and $578.08 in 1943. The war years which brought Krim-Ko increased sales also brought a sharp decline in bad debts. These were facts which the Commissioner was certainly entitled to take into account, and, in the circumstances, he did not abuse his discretion in concluding that the reserve as it then stood did not require augmentation at that time.

2. The remaining issue relates to the correctness of the respondent's determination that amounts reflected in credit balances in the advertising accounts, carried on the books of Krim-Ko in the names of its customers at the end of the years 1942, 1943, and 1944, should have been included in the taxable income of Krim-Ko for those years. Apart from the year 1942, which will be discussed separately, the Commissioner treated as income of Krim-Ko the net amounts by which the credit balances were increased in each of the taxable years. For each year that amount was the excess of credits to the accounts over charges against them. Thus, the amount in controversy for the year 1943 is $13,072.65, which is equal to the excess of $30,963.07 in credits over $17,890.42 in charges made during that year. Stated otherwise, although Krim-Ko received $30,963.07 from its customers during 1943 for advertising material and services, it expended at most only $17,890.42 [2] for that purpose, and the Commissioner contends that the difference, $13,072.65, constitutes income to Krim-Ko.

---

[2] The record does not show that Krim-Ko actually expended that amount in full. Conceivably, the cost of the advertising to it may have been less. However, no issue has been raised as to this point.

Petitioner, on the other hand, argues that the advertising account was a trust fund, "a fund belonging to [Krim-Ko's] customers"; that Krim-Ko itself "acted only as a conduit through which payment for advertising and promotional services was made"; and that none of the payments made by its customers for advertising could be included in the gross income. We disagree. The receipts on account of the so-called advertising charges did not constitute a trust fund for customers, nor were they set aside in any other way as the property of the customers.

Petitioner's contentions find no support in the provisions of the agreements between Krim-Ko and its customers which were introduced in evidence. Therein Krim-Ko agreed to furnish certain designated advertising material and sales promotion services and its customers agreed to pay therefor a price per gallon for a specified number of gallons of syrup in excess of the base price charged in instances where such material and services were not furnished. The agreements placed no restriction upon Krim-Ko's use or disposition of any amounts received by it for advertising material and services and did not indicate that it was to act as a depository, conduit, trustee, or agent with respect to them.

At most, Krim-Ko, as an adjunct to its principal business, had undertaken to sell special advertising material and services to its customers. The amounts which it received for that purpose must be reflected in gross income, which may be reduced by the amount of expenditures which it made in connection therewith.

In support of its position that the credit balances belonged to the customers, petitioner points out that in some instances Krim-Ko refunded such credit balances to its customers or credited them to the customers' trading accounts. But there was no provision in the agreements requiring such refunds or credits, and the fact is that the amount of the credit balances increased steadily from $8,983.36 at the end of 1941 to some $57,000 at the end of 1946. Moreover, correspondence placed in evidence by petitioner, relating to several instances where either the amount of a credit balance was refunded or credited to a customer's trading account, indicates that, in making such refunds or credits, Krim-Ko was probably motivated by a desire to help customers who were delinquent in their payments for syrup purchased or who were short of funds rather than by any recognition of a legal obligation to repay or refund unexpended balances.

Under our revenue laws income is determined on an annual basis. During each of the taxable years Krim-Ko received under the agreements with its customers substantial amounts for advertising material and services in excess of expenditures. We are not convinced on the record in this case that, as of the end of each of these years, there

was any reasonable assurance that the excess amounts would ever be expended for the customers, in full or in substantial part. As noted above, the amounts did not constitute a trust fund. They were paid in consideration for Krim-Ko's promise to furnish designated advertising material and services. They belonged to Krim-Ko and it treated them as its property by commingling them with its other assets. Having been received under claim of right and without restriction as to disposition, they constitute income in the year of receipt or accrual notwithstanding that Krim-Ko or its successor might in later years make refunds or expenditures with respect to them. Cf. *Brown* v. *Helvering*, 291 U. S. 193; *Capital Warehouse Co.*, 9 T. C. 966, affd. (C. A. 8), 171 Fed. (2d) 395; *Clay Sewer Pipe Assn.*, 1 T. C. 529, affd. (C. A. 3), 139 Fed. (2d) 130; *Your Health Club, Inc.*, 4 T. C. 385; *E. B. Elliott Co.*, 45 B. T. A. 82; *South Tacoma Motor Co.*, 3 T. C. 411. To the extent that refunds or expenditures are made in later years in carrying out the agreements, the taxpayer will receive the benefit of them tax-wise in such years. Meanwhile, the amounts received by Krim-Ko must be reflected in gross income in accord with the principles applied in the foregoing decisions. This case is governed by those principles, and is to be distinguished from *Seven-Up Co.*, 14 T. C. 965, where, under the special facts there presented, the taxpayer was thought to be a mere conduit in passing funds from its customers to an advertising agency.

We therefore approve respondent's action in including in the taxable income of Krim-Ko the amounts by which the credit balances in the advertising accounts were increased during the years 1943 and 1944. However, we do not approve his determination with respect to the year 1942. Respondent included in gross income the entire credit balance of $16,536.18 as of the end of 1942. But the credit balance as of the end of 1941 was $8,983.36, and the increase in 1942 was merely the difference between those two figures, namely, $7,552.82. It is only the latter amount which may be included in gross income for 1942. During 1942, Krim-Ko's total receipts with respect to advertising were $27,614.74, and its expenditures for that purpose were listed as aggregating $20,061.92. The difference between these two figures—$7,552.82—is the same as the increase in the credit balance during 1942, and represents the income chargeable to it in 1942. Respondent's determination would result in a distortion of income, since it in effect would attribute to the year 1942 receipts already reflected in the credit balance prior to 1942. Respondent erred in including more than $7,552.82 in Krim-Ko's income for 1942 in connection with this issue.

*Decision will be entered under Rule 50.*