BROADCAST MEASUREMENT BUREAU, INC., PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21519.   Promulgated May 10, 1951.

*Laurence F. Casey, Esq.*, for the petitioner.
*Sheldon V. Ekman, Esq.*, for the respondent.

990

994

OPINION.

Hill, *Judge:* The first question for our determination is whether petitioner realized any income in the fiscal year ended June 30, 1946. It is respondent's contention that BMB realized net income in the amount of $99,370.19 in that year. This figure constitutes petitioner's gross receipts, which came totally from subscription fees in these 12 months, less both its disbursements in that year for Study No. 1 and a net operating loss carried back from the fiscal year ended June 30, 1947. Petitioner argues that it had no gross income in the year under consideration on the ground that it received the subscription fees for the specific purpose of performing Study No. 1, and pursuant to a contract with subscribing stations and networks whereby it was obligated to refund any unexpended portion of those fees following the close of Study No. 1. In petitioner's view by virtue of the subscription contracts it did not receive the subscription fees under a claim of right and furthermore it had a definite, unconditional obligation to repay or return the unexpended balance of the subscription fees. Respondent challenges petitioner's contentions for three principal reasons. First, he declares that BMB was not obligated under its contract with subscribers to refund the excess of subscription fees over expenses of Study No. 1. Secondly, assuming such a contractual liability, he asserts that the fees paid in the fiscal year ended June 30, 1946, were received under a claim of right and there was no definite, unconditional obligation to refund any part of them as of the close of the fiscal year in issue so that under the doctrine of both *Commissioner*

v. *Wilcox*, 327 U. S. 404, and *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, these subscription fees constituted gross income. Finally respondent states that petitioner is not entitled to deduct the excess of subscription fees over disbursements existing at the close of the fiscal year ended June 30, 1946, since there was no liability to refund it at that time, and we may not look beyond events occurring in that year, citing *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, and *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281.

We are convinced that the subscription fees to Study No. 1 which petitioner received in the fiscal year ended June 30, 1946, were impressed with a trust upon their receipt to expend them solely to meet the costs of Study No. 1 so that they constituted a trust fund in its hands rather than income. Whether a trust existed with regard to the subscription fees received by BMB in the fiscal year ended June 30, 1946, depends upon the intent of the parties. No express words of trust were used, but none are necessary. *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464. Close analysis of the subscription contracts entered into between petitioner and subscribing stations and networks, the understanding of the parties with regard to these contracts, and the performance of petitioner in execution of these contracts persuades us that the parties intended that BMB receive the subscription fees in trust for the subscribers to carry out Study No. 1. We find a reasonable certainty as to the property, the objects and the beneficiaries, and in such a situation no particular form of words is necessary to create a trust. *Chicago, Milwaukee & St. Paul Railway Co.* v. *Des Moines Union Railway Co.*, 254 U. S. 196.

The subscription contracts entered into between BMB and subscribing stations and networks for Study No. 1 expressly provide for subscription fees of a fixed amount for the performance of a single study. Use of these fees for any other corporate purposes including any future studies would be in direct violation of the contract terms. Thus petitioner was narrowly restricted in the use of the subscription fees.

Furthermore, we interpret the aforesaid subscription contracts to provide that petitioner was obligated to return to subscribers either as a refund or as a credit on future studies, any excess of fees over the actual costs of Study No. 1 after the conclusion of such study. These subscription contracts expressly state in part:

> It is mutually understood and agreed that the amount of this subscription fee may be adjusted by Broadcast Measurement Bureau, Inc. upon the completion of the first study. * * *

Respondent contends that a refund or credit was not contemplated by the parties to the contract when they used the word "adjusted," and even assuming that such was their intent, the words "may be" are per-

missive in nature and therefore a refund of unexpended fees was not mandatory but within petitioner's discretion. This conclusion is borne out, he says, by the new station subscription contract form used after July 1, 1947, which provides that any excess "shall be returned to the subscribers as a refund or credit." He contends that the use of the word "refund" and the mandatory language in this later contract constituted a change in the obligations assumed by petitioner brought on by the fact that a revenue agent was examining petitioner's books at the time.

There can be little doubt that the first subscription contract used by BMB and its subscribers was not drafted in clear language, so that the phrase "may be adjusted" is capable of several interpretations, including that suggested by respondent. In determining the true meaning of this phrase, we find little help from an examination of the contracts used by BMB and its subscribers after June 30, 1947. We note that the language of clause 8 of such subscription contracts with stations and the language of clause 8 of such subscription contracts with networks, while dealing with the same subject matter, contrast sharply in their treatment of a refund or credit following each final industry accounting. It is true the language in the subscription contracts with stations has the effect of making a refund or credit mandatory. But clause 8 of the subscription contract with networks, states in part:

The Bureau agrees that at the time of any final Industry accounting the total subscription fees paid in by the Subscriber since the preceding final Industry accounting may be adjusted downward by the Bureau as a rebate or credit * * *

This language on its face is clearly permissive in nature and would not impose a definite obligation on petitioner to return unexpended subscription fees in the form of a refund or credit. Nevertheless we can find no evidence which would lead us to believe that BMB intended a different treatment of excess subscription fees as between stations and networks. Therefore we hesitate to draw any conclusion from a reference to the later contracts.

We prefer to determine the true meaning of the phrase "may be adjusted," as used in the contracts prior to July 1, 1947, from the testimony of representatives of the contracting parties, and from written evidence introduced at the hearing which was contemporaneous with the signing of these contracts. The testimony of witnesses representing both subscribers and BMB is unanimous that it was their understanding that BMB was obligated by the contract to return either as a refund or as a credit on future research studies, any unexpended fees following the close of Study No. 1. Furthermore, in its publication "To Date," distributed to stations and networks in 1946, BMB made statements set forth in our findings, whose clear

import is that BMB considered itself bound to return to subscribers as a refund or credit any excess of fees over expenses after the close of Study No. 1.

Moreover, this interpretation of the contract phrase seems entirely reasonable to us. There is a plausible explanation for the use of the words "may be adjusted" other than that BMB had a discretion whether to return unexpended receipts. The fees charged were calculated to cover the costs of Study No. 1, yet due to the uncertainty regarding both the total costs and the total number of stations and networks which would subscribe, it was possible that the fees would either exceed or be less than the costs. In such a case an adjustment would be necessary, but this necessity was not certain. Turning to the word "adjusted," clearly it is susceptible of meaning either an upward or downward revision of the fees paid in. That a refund or credit was contemplated as a possibility by the parties as well as an additional levy on subscribing stations is borne out by a succeeding phrase which states "Should such adjustment result in an increase in the amount of this subscription fee  *  *  *." Furthermore it is difficult to believe subscribers would be willing to enter into a contract whereby BMB had the right to ask additional payments up to 25 per cent of the original fees to meet Study No. 1 expenses, and also had a discretion whether to return any unexpended fees. The fact that so many subscribers voluntarily entered into such a contract is a strong indication of a mutual understanding that a refund or credit was just as much an obligation of petitioner, if expenses were less than fees paid in, as it was a right of petitioner to make a further assessment from its subscribers, if subscription fees failed to meet the cost of Study No. 1. We therefore conclude that under these contracts it was mandatory that BMB return to subscribers the entire amount of any excess of subscription fees over the costs of Study No. 1. The fact that petitioner retained the right to determine the date for the conclusion of Study No. 1 and the date of returning any unexpended fees as well as the right to determine which subscribers would be eligible for a refund or credit in no way detracts from that obligation.

It is thus clear that these subscription contracts were not contracts for the performance of services by BMB at a profit. BMB could only expend the subscription fees to the extent necessary to meet the costs of Study No. 1. Furthermore the mechanical services necessary for performance of Study No. 1 were farmed out by petitioner. It was the understanding of the members of BMB and subscribers alike that the latter would bear the expenses of this study, but nowhere is there any evidence that petitioner was to receive any compensation for the performance of Study No. 1. In this connection we note the provision in BMB's charter that it is a non-profit concern and that there shall be no capital stock. No capital stock has ever been issued. Moreover by

the very nature of its contractual undertaking it was settled from the outset that petitioner would receive no gain regardless of the fact that it would not be known until the close of Study No. 1 whether subscribers would receive a refund or credit or whether they would be asked to pay over additional sums to meet the costs of Study No. 1. Thus in no sense was petitioner selling services to subscribers. It performed services as the agency of the subscribers at the latter's expense confined to the cost to petitioner in such performance. Petitioner got no compensation for its services.

The terms of the subscription contracts and the understanding of the parties as to their meaning make it clear that BMB was merely a designated fiduciary empowered by subscribers to discharge the spe cific function of performing Study No. 1 with funds provided entirely by the latter, but any excess fees had to be returned after the conclusion of the study.

In the performance of its subscription contracts BMB conducted itself as a fiduciary empowered to utilize funds for a specific purpose. It compiled broadcast audience data, prepared and distributed surveys to subscribers, and shortly after the close of Study No. 1 on June 30, 1947, it issued a financial accounting to subscribers. In December 1947 petitioner recognized its contractual obligation to return to subscribers the entire excess of subscription fees over the costs of Study No. 1 by a resolution of its board of directors and by entries on its books setting forth a liability of $99,370.19 to subscribers to Study No. 1. The fact that no refund or credit has as yet been made does not derogate from petitioner's recognition of its obligation to do so. It has delayed action until its income tax liability could be determined, considering that any taxes found due were a proper item of expense for Study No. 1.

We find further support for our conclusion that the subscription fees for Study No. 1 constituted a trust fund in the fact that late subscribers to the study were given no financial advantage over those who subscribed at the start. The late subscribers were required to contribute the full amount of their subscription fees.

A further indication that the subscription fees for Study No. 1 constituted a fund in the nature of a trust fund is found in the fact that subscribers to later studies were not allowed to benefit from the excess of fees contributed for Study No. 1 over the costs thereof. This excess of $99,370.19 was not released for use in Study No. 2, pending determination of petitioner's tax liability, until a sufficient number of subscribers to later studies waived their contract cancellation privileges to insure that receipts would be available to replace and preserve this amount in its entirety for the benefit of subscribers to Study No. 1.

It may be argued that the subscription fees to Study No. 1 did not constitute a trust *res* due to the fact these funds were never segre-

gated in a separate bank account from sales receipts received in 1947, loans received by petitioner, and receipts from subscriptions to later studies. But such a commingling of the subscription fees for Study No. 1 with other receipts does not destroy their identity as a trust fund. *Seven-Up Co.*, 14 T. C. 965. Petitioner's books showed the total amount of such fees it received and the unexpended balance thereof at all times. Any improper use of the unexpended balance of these fees by their custodian could have been enjoined by the subscribers to Study No. 1 by a suit in equity. *Portland Cremation Association* v. *Commissioner*, 31 F. 2d 843.

In view of all the above circumstances we have found as a fact and now hold that the subscription fees received by BMB for Study No. 1 constituted a fund in the nature of a trust fund in its hands for use by it only to the extent of the cost to it of such study and the promulgation of the results thereof. See *Seven-Up Co.*, *supra*.

It is thus clear these subscription fees received in the fiscal year ended June 30, 1946, did not constitute gross income to petitioner. Applying the tests laid down by *North American Oil Consolidated* v. *Burnet*, *supra*, BMB did not receive earnings under a claim of right and without restriction as to their disposition in that year. It did not receive the subscription fees as its own property but rather as burdened with the obligation to use them to meet the costs of Study No. 1 and return any excess. While at the close of the fiscal year ended June 30, 1946, there was no definite, unconditional obligation on BMB to refund any part of the subscription fees, since the study had not closed, yet there was always an absolute obligation on petitioner to return any part of the fees not needed to meet the costs of the study. We have previously noted that there was no possibility of gain or profit to petitioner from the receipt of these fees. The Supreme Court in *Commissioner* v. *Wilcox*, *supra*, declared that the possibility of gain or profit was the very essence of taxable income. Therefore we conclude and hold that petitioner realized no gross income and thus no net income in the taxable year ended June 30, 1946.

We do not consider our holding to conflict with our decision in *Clay Sewer Pipe Association, Inc.*, 1 T. C. 529, affd., 139 F. 2d 130, wherein we held that the excess of payments made to the taxpayer corporation by its stockholder-subscribers over the corporation's expenses at the close of the taxable year in dispute constituted taxable income. The taxpayer in that case impliedly conceded that the payments thus received were gross income to it except for the portion thereof which exceeded its corporate expenditures. Furthermore such payments received by that taxpayer could be used in its general business so that there was not such a restriction on its use of fees from its stockholders as would constitute them a trust fund. Thus the

facts of that case are readily distinguished from those of the present case.

Our decision in the recent case of *Krim-Ko Corporation*, 16 T. C. 31, is similarly distinguishable on the facts. Taxpayer there was a profit-making concern. It had not undertaken to return the unexpended sums it received from some of its customers for the purpose of furnishing designated advertising materials and services. Its agreements with customers did not place any restriction on the use of any amounts received by it for advertising, nor indicate in any way it was to act as a trustee.

In view of our holding on the first question it is unnecessary for us to determine the second question, whether BMB was exempt from Federal income and excess profits taxes under sections 101 (7) and 727 (a) of the Code, respectively, in the fiscal year ended June 30, 1946.

We pass to the third question for our determination, whether petitioner was liable for a 5 per cent delinquency penalty under section 3612 (d) (1) of the Code for failure to timely file its excess profits tax return for the fiscal year ended June 30, 1946. In view of our prior holding that petitioner received no gross income in this period, it follows that petitioner realized no excess profits income that year. By virtue of section 729 (b) (2) of the Code BMB was not required to file an excess profits tax return under these circumstances. We therefore hold that respondent erred in determining a 5 per cent penalty against petitioner for failure to timely file such a return.

Reviewed by the Court.

*Decision will be entered for petitioner.*

DISNEY, *J.*, concurs in the result.

---

MURDOCK, concurring: The result in this case would be right even assuming that the petitioner was in position to realize income from the gross amounts which it received from subscriptions because such income could be computed only upon a completed contract basis, the contract was not completed in the fiscal year 1946 and, therefore, the excess of receipts over expenditures for the 3-year period would not be income for the middle year.

---

TURNER, *J.*, concurring: While I agree with the result in this case, I am unable to agree that a trust relationship existed between the petitioner and its members and that the excess of the amounts paid by contributing members, over and above the petitioner's costs of operations, constituted a trust fund. As I read the facts, the opera-

tions of the petitioner and the use by it in those operations of the moneys received were not intended to be subject to the restrictions and controls applicable to trusts and trustees, and there is nothing in the actual operations from which any implications to that effect are justified. The injection of trust law not only is not needed for the disposition of this case, but, in future cases, where the result must turn wholly upon the existence or non-existence of trusts, the pronouncements here can only cause trouble and confusion.

The relationship between the petitioner and its members was simply a contract relationship. There was no net income, and therefore no deficiency in income tax, merely because there was always a valid and binding obligation requiring the petitioner to repay to dues-paying members any and all sums not required in the making of Study No. 1. The situation here, in many respects, is similar to that which existed in *Uniform Printing & Supply Co.* v. *Commissioner*, 88 F. 2d 75.

Due to possible differences in the relationship between the members themselves and between members and the petitioner with respect to the financing of Study No. 2, it is possible a different result might be required. But that is another matter, and is not involved in this case.

KERN and RAUM, *JJ.*, agree with this concurring opinion.