PARK PLACE, INC:, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4688–68.    Filed March 14, 1972.

*John D. Armstrong* and *William Royall Middlethon, Jr.*, for the petitioner.

*Andrew H. Weinstein* and *John H. W. Cole*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the income tax of petitioner Park Place, Inc., for calendar years 1965 and 1966 in the amounts of $4,234.99 and $755.74, respectively, the entire amounts of which are in controversy.

Petitioner is a cooperative housing corporation organized under the laws of the State of Florida, and during the calendar years in question it timely filed corporate income tax returns with the office of the district director of internal revenue in Jacksonville, Fla.

In calendar year 1965 the Commissioner disallowed claimed deductions for depreciation of a building and other tangible property except to the extent of $1,544.80 (the annual straight-line depreciation for

the fraction of the basis of the personal property and building allocable to the one dwelling unit petitioner leased to a nonstockholder). The Commissioner conceded a like amount for calendar year 1966 (although petitioner did not claim the deduction in its return that year), but also increased petitioner's gross income by $4,980 of credits carried on the corporate books which were attributable to assessments collected from stockholders in calendar year 1966, but neither spent nor refunded in that year. Since petitioner reported the entire amount of assessments collected in 1965 in its 1965 income tax return, it necessarily reported as income any portion constituting overassessments for that year. Thus the Commissioner did not determine in the statutory notice that overassessments collected in 1965 were includable in petitioner's gross income.

The gist of the petition is that for both of the taxable years in issue either that depreciation deductions should be allowed or alternatively that annual gross assessments collected from stockholders should not be included in petitioner's gross income. Either way petitioner would owe no tax. We are not presented with a claim for a credit or refund, however, since petitioner claimed it owed no tax in its income tax returns for the taxable years in issue and therefore made no tax payment.

We need not discuss in detail the merits of petitioner's preliminary contention that the Commissioner has the burden of proving that petitioner's 1965 depreciation deduction is not allowable on the ground that the Commissioner failed to inform petitioner adequately of the basis of disallowance of the claimed deduction in the statutory notice. We think the deficiency notice is proper and that the pleadings and presentation of the evidence shows that the issues were adequately understood by the parties.

Furthermore in the so-called "30-day letter" for the years 1964, 1965, and 1966 (though it was not spelled out in the deficiency notice) the following explanation of the disallowance of depreciation appeared:

(a) Depreciation Decreased

Taxpayer depreciated the value of each of the units in the cooperative apartment building.

Since the sale of the proprietary leases to the members by the corporation is considered sale of the apartment and since no landlord tenant relationship exists between the owners of the apartments and the corporation depreciation is disallowed as a personal expense except for the one unit rented for income production.

The Commissioner denied at trial that there is any issue in this case whether Park Place, Inc., is a cooperative housing corporation

for purposes of section 216, I.R.C. 1954.[1] Petitioner contends that it is. To be sure, no deficiency of a stockholder is before the Court, and no question concerning the application of section 216 (a) and (c) on the stockholder level of a cooperative housing corporation is involved. Petitioner did not plead specifically that Park Place, Inc., is a cooperative housing corporation. Nevertheless the petition contains allegations and the parties stipulated to facts sufficient for us to decide, which we shall, whether petitioner meets the statutory requirements of section 216(b) (1) and (2).

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated. Sec. 216 provides in part:

SEC. 216. DEDUCTION OF TAXES, INTEREST, AND BUSINESS DEPRECIATION BY COOPERATIVE HOUSING CORPORATION TENANT-STOCKHOLDER.

(a) ALLOWANCE OF DEDUCTION.—In the case of a tenant-stockholder (as defined in subsection (b)(2)), there shall be allowed as a deduction (not otherwise deductible) paid or accrued to a cooperative housing corporation within the taxable year, but only to the extent that such amounts represent the tenant-stockholder's proportionate share of—

(1) the real estate taxes allowable as a deduction to the corporation under section 164 which are paid or incurred by the corporation on the houses or apartment building and on the land on which such houses (or building) are situated, or

(2) the interest allowable as a deduction to the corporation under section 163 which is paid or incurred by the corporation on its indebtedness contracted—

(A) in the acquisition, construction, alteration, rehabilitation, or maintenance of the houses or apartment building, or

(B) in the acquisition of the land on which the houses (or apartment building) are situated.

(b) DEFINITIONS.—For purposes of this section—

(1) COOPERATIVE HOUSING CORPORATION.—The term "cooperative housing corporation" means a corporation—

(A) having one and only one class of stock outstanding,

(B) each of the stockholders of which is entitled, solely by reason of his ownership of stock in the corporation, to occupy for dwelling purposes a house, or an apartment in a building, owned or leased by such corporation,

(C) no stockholder of which is entitled (either conditionally or unconditionally) to receive any distribution not out of earnings and profits of the corporation except on a complete or partial liquidation of the corporation, and

(D) 80 percent or more of the gross income of which for the taxable year in which the taxes and interest described in subsection (a) are paid or incurred is derived from tenant-stockholders.

(2) TENANT-STOCKHOLDER.—The term "tenant-stockholder" means an individual who is a stockholder in a cooperative housing corporation, and whose stock is fully paid-up in an amount not less than an amount shown to the satisfaction of the Secretary or his delegate as bearing a reasonable relationship to the portion of the value of the corporation's equity in the houses or apartment building and the land on which situated which is attributable to the house or apartment which such individual is entitled to occupy.

(3) The term "tenant-stockholder's proportionate share" means that proportion which the stock of the cooperative housing corporation owned by the tenant-stockholder is of the total outstanding stock of the corporation (including any stock held by the corporation).

\* \* \* \* \* \* \*

(c) TREATMENT AS PROPERTY SUBJECT TO DEPRECIATION.—So much of the stock of a tenant-stockholder in a cooperative housing corporation as is allocable, under regulations prescribed by the Secretary or his delegate, to a proprietary lease or right of tenancy in property subject to the allowance for depreciation under section 167(a) shall, to the extent such proprietary lease or right of tenancy is used by such tenant-stockholder in a trade or business or for the production of income, be treated as property subject to the allowance for depreciation under section 167(a).

Whether or not we decide that petitioner is a cooperative housing corporation, discussion of the allowability of the depreciation deductions will be necessary. In any event we think we should discuss the parties' contentions concerning the treatment of the stockholder assessments. Their contentions overlap, the petitioner claiming that the annual gross assessments collected from stockholders in 1965 as well as 1966 should not be included in its gross income, while the Commissioner restricts his case to the portion of the 1966 assessments which constitutes *overassessments* for that year. In view of our disposition of the case, we distinguish the treatment of the overassessments from that of the balance of the gross assessments and discuss them, both for 1965 and 1966, as separate issues. We turn below to petitioner's contentions as to these issues, after first deciding the depreciation question.

FINDINGS OF FACT

Some of the facts are stipulated and are incorporated herein together with the joint exhibits.

Park Place, Inc., is a Florida business corporation organized for the purpose of erecting and operating a cooperative apartment building in Palm Beach, Fla., and to enter into perpetual proprietary leases of the dwelling units in the building with its stockholders. During the taxable years all of the apartments in the building but one had been disposed of to "lessees" pursuant to "Perpetual Proprietary Lease(s)." The certificate of incorporation was filed with and approved by the secretary of state of the State of Florida on January 14, 1957, and petitioner has been a validly existing Florida corporation since that time.

Articles III and IV of the certificate of incorporation provide that petitioner was not to commence business until its entire authorized capital, $500, had been fully paid up. Article I of petitioner's bylaws declares that the corporation is not to be operated for profit, although the preamble of the certificate of incorporation states that petitioner is a corporation for profit.

During the taxable years all but one of the dwelling units in the apartment building were occupied by holders of perpetual proprietary leases. Only they are entitled to own stock, and shares are transferable without consideration only to new tenants upon the termination of an existing lease or upon the creation of a new leasehold.

The terms of the lease signed by each stockholder are set forth in a uniform printed contract. All leases concluded by petitioner and the proprietary lessees contain substantially the same covenants which, it is further covenanted, cannot be changed without the approval of holders of at least 80 percent of the perpetual proprietary leases.

Petitioner covenants with each proprietary lessee that, if pursuant to a fundamental change in the corporation it is determined to sell the entire property of the corporation or in the case of an involuntary disposition of its assets, the proprietary lessee is entitled to a liquidating dividend proportionate to his equity. Petitioner covenants to repair minor damage to the building, but if the apartment building is damaged so extensively by fire or other causes as to be untenantable and the lessees determine not to replace the building, petitioner covenants to distribute the proceeds of any casualty insurance in effect to the proprietary lessees. Petitioner is forbidden to mortgage or encumber the building or land without authorization given in a meeting of the lessees.

Petitioner commenced corporate existence prior to acquiring real property upon which the apartment building in question was subsequently built. The corporation has been at all times the record title holder of the land and improvements thereon. During the years at issue petitioner erected only one building, which was completed January 11, 1958, and which together with the land, improvements, and equipment thereon constituted its total tangible assets during the taxable years.

In its corporate income tax returns for each of the calendar years 1961 through 1966 petitioner stated in response to a specific inquiry that its principal business activity was cooperative housing.

At least 80 percent of petitioner's gross income in both of the taxable years was derived from the stockholders. However, petitioner realized ordinary rental income from the single dwelling unit in the apartment building that was leased to a nonstockholder (the "manager").

Petitioner issued 41 of the total 150 authorized shares of capital stock, one each to a dwelling unit in the apartment building excepting the unit which was held for the production of income, the manager's residence. The shares were issued only to individuals, and at all times afterwards it appears that individuals only have owned petitioner's stock. The par value of each share is $10 and petitioner has only one class of capital stock. No individual stockholder is entitled to receive any distribution which is not out of the earnings and profits of petitioner, except on the liquidation of the corporation.

Each stockholder is assessed annually an amount equal to his share of the sum of the anticipated cash requirements after taking into account estimated income from sources other than perpetual proprietary leases needed to defray expenses denominated class 1 and class 2 expenses, respectively. The board of directors of the corporation is empowered to fix the amount and frequency of payment of such assess-

ments. The stockholders are assessed equally for the class 1 expenditures, of which wages, grounds, and swimming pool maintenance, etc., are representative and the benefits of which inure to the tenants equally. The class 2 expenses are prorated according to the size and location of the apartments and include for example real estate taxes, mortgage payments, *if any* (it does not appear from the evidence that any mortgage or interest payments were made during the years in question), fire and storm insurance, and repair and maintenance expense.

In February following the end of each calendar year the stockholders conduct a meeting at which, among other things, petitioner submits financial statements for the previous year for the stockholders' approval. Separate balance sheets, which resemble income statements in some respects, are prepared for the class 1 and class 2 expenses and the respective assessments income attributable thereto. The income derived from the apartment unit held for the production of income and certain income from patronage of common laundry facilities is allocated to the class 2 balance sheet. Net worth is indicated on the class 1 balance sheet only.

At the end of calendar year 1965, the increase in class 1 balance sheet liability for stockholder assessments in excess of the expenses for that year was $4,021.26; the same item in the class 2 balance sheet that year increased by $16,773.84. At the end of calendar year 1966, the class 1 liability decreased by $657, while the class 2 liability increased by $5,637.

The Commissioner determined that the net overassessments due the stockholders in calendar year 1966 was $4,980. It was petitioner's custom to retain the overassessments on its books indefinitely; no part of any overassessments accumulated by the end of calendar year 1965 was refunded to the stockholders during 1966. Petitioner did not refund the 1966 overassessments in money to the tenant-stockholders within 8½ months after the close of calendar year 1966.

The amount of the annual straight-line depreciation and other data concerning the items of real and personal property owned by petitioner and having a useful life beyond the years in which acquired are tabulated below:

| Property | Original cost | Useful life years | Amount of depreciation | |
| --- | --- | --- | --- | --- |
| | | | 1965 | 1966 |
| Building and equipment | $1,750,000.00 | 40 | $43,750.00 | $43,750.00 |
| Lawnmower | 154.35 | 4 | 6.43 | |
| TV antenna | 107.49 | 5 | 21.50 | 5.36 |
| Swimming pool pump | 593.27 | 10 | 59.33 | 59.33 |
| Steel safe | 65.15 | 10 | 6.51 | 6.51 |
| Total | | | 43,843.77 | 43,821.20 |

A fraction equal to 1.47 percent of the annual depreciation for each asset is the amount of depreciation allocable under section 167 to the single dwelling unit in the apartment building that was leased to a nonstockholder.

In its income tax return for 1965 petitioner claimed deductions for depreciation and for Florida and local taxes in the amounts of $43,844 and $33,670, respectively; in 1966 petitioner claimed a deduction of $36,777 for taxes but no deduction for depreciation. Petitioner did not claim a deduction for interest paid in those returns or in any return for the calendar years 1961 through 1964 inclusive.

OPINION

The parties stipulated that Park Place, Inc., meets the standards of subparagraphs (A), (B), and (C) of section 216(b)(1), and also that 80 percent or more of the gross income of the corporation is derived from its stockholders. To determine whether petitioner is a cooperative housing corporation it is only necessary to decide whether each of the stockholders of petitioner is a "tenant-stockholder" as the term is defined by section 216(b)(2), due to the reference in subparagraph (D). That section makes tenant-stockholder status turn on whether a stockholder is fully paid up to the satisfaction of the Secretary of the Treasury or his delegate at least to the extent of the proportionate equity of the corporation in the stockholder's premises. Section 1.216–1 (e), Income Tax Regs., provides as follows:

(e) *Tenant-stockholder.* The term "tenant-stockholder" means an individual who is a stockholder in a cooperative housing corporation, as defined in section 216(b)(1) and paragraph (d) of this section, and whose stock is fully paid up in an amount at least equal to an amount shown to the satisfaction of the district director as bearing a reasonable relationship to the portion of the fair market value, as of the date of the original issuance of the stock, of the corporation's equity in the building and the land on which it is situated which is attributable to the apartment or housing unit which such individual is entitled to occupy.

We think the quoted language of the regulation is a reasonable interpretation of the statute.

It is safe to conclude from the evidence that in the taxable years each of the subscribers to the authorized capital stock had fully paid for his shares and that his contribution necessarily exceeded his share of the corporate equity in the land and building. We hold that petitioner in the years in question was a cooperative housing corporation for purposes of section 216.

The Commissioner contends that the cooperative housing corporation may not depreciate the property it holds for the benefit of the tenant-stockholders and that the unrefunded overassessments carried on the corporate books at the end of the taxable year are includable in

the corporation's gross income. We are concerned here with the distribution of tax burdens and benefits in the aftermath of the enactment of section 216 and its 1962 amendment, which recognizes cooperative ownership of what otherwise might be deemed rental property and confers upon tenants who are cooperative stockholders the privilege of deducting from gross income State and local taxes and mortgage interest paid by the corporation, and if otherwise allowable, depreciation. We think that the Congress intended that these deductions may not be claimed both on the corporate level and on the tenant-stockholder level, and that petitioner may not claim a deduction for depreciation.[2]

At the outset, we can discern no policy suggesting a treatment of the cooperatives that is more favorable than that of condominiums or homeowners, although this would be the case if cooperative housing corporations themselves were entitled to deduct depreciation. Further, if the Congress when it enacted section 216(c) in 1962 had intended that both the cooperative housing corporation and its tenant-stockholders could henceforth depreciate the same asset we think it surely would have said so—which it did not do.

The statute, and the committee reports and debates, are silent on this precise issue.[3] However, we think that the legislative history surrounding section 216 supports, if only indirectly, the reasonableness of our conclusion.

It appears that the earliest consideration given to enacting a provision such as section 216 dates from 1928. The Senate Finance Committee deleted it from the House version of the Revenue Bill of 1928, citing tax avoidance and discrimination against ordinary renters as grounds for this action.[4] Nine years later a Federal District Court in New York decided that the general provisions of the Code did not support the deduction of interest and taxes by cooperative stockholders and that if the benefit of these deductions were to be "passed through" to the stockholders, specific legislation would be necessary. *Wood* v. *Rasquin*, 21 F. Supp. 211, 213 (E.D.N.Y. 1937), affirmed per curiam 97 F. 2d 1023 (C.A. 2, 1938). Thereafter the interest in obtaining the enactment

---

[2] To the extent that our conclusions herein are contrary to those in *Lake Forest, Inc.*, T.C. Memo. 1963–39, that case is not binding on this Court.

[3] The Senate Finance Committee report on the Revenue Bill of 1942 does state that the stockholders may not avail themselves of sec. 216 if the same deductions are allowable to them under other sections of the Code. S. Rept. No. 1631, 77th Cong., 2d Sess., p. 97.

[4] S. Rept. No. 960, 70th Cong., 1st Sess., p. 21. As the report explained it: "It appears certain that this deduction would be practically impossible to administer and would afford an easy means of tax evasion in many cases. Moreover, it is not given to the great number of individuals who lease apartments by the year. In view of these objections and of the fact that under existing law the purchaser of a cooperative apartment is already permitted to deduct the interest on the unpaid portion of the purchase price of the apartment, the commitee has eliminated this provision from the bill."

of relief legislation was renewed, and over the objection of the Treasury Department [5] the predecessor of section 216 was added by the Senate to the Revenue Bill of 1942 and enacted into law.

The facts of *Wood* v. *Rasquin, supra,* apparently became the basis of the brief for the cooperatives during the hearings on the Revenue Bill of 1942. The cooperative corporation involved in that case did not operate for profit. Rather, it regularly assessed its tenant-stockholders only enough to meet anticipated operating expenses and taxes. Upon joining the cooperative, each tenant paid at once for his stock an amount which represented his share of the corporation's investment in the demised premises.[6] Under these circumstances, it is not surprising that the legislators did not dwell on the issue whether the corporation would continue to deduct taxes and interest after these benefits had been settled upon the tenant-stockholders by remedial legislation. As the corporation was budgeted to show no profit each year, and therefore to owe no tax, the availability of the customary deductions on the corporate level meant no tax savings either to the corporation or to the stockholders, and it was no doubt assumed that it was precisely in the interest of making the deductions effective as a matter of substance that the special legislation was urged.

---

[5] Randolph Paul, then tax adviser to the Secretary of the Treasury, echoed the objections raised in 1928. See statement of J. F. Eagle, Hearings before Senate Committee on Finance on H.R. 7378, 77th Cong., 2d Sess., p. 172:

Mr. Paul, in assigning the reasons for the Senate deleting the provision in the 1928 Revenue Act, says:

(1) "It was believed that such a deduction would be practically impossible to administer and would afford an easy means of tax evasion in many cases";

(2) "It was also pointed out that no comparable deduction was given to the great number of individuals who leased apartments by the year"; and

(3) "The purchaser of a cooperative apartment is permitted to deduct the interest on the unpaid portion of the purchase price of an apartment."

[6] See Hearings, Senate Finance Committee, 77th Cong., 2d Sess., testimony of J. F. Eagle, p. 164:

"The so-called cooperative apartment corporation is one organized not for profit but for the purpose of holding title to an apartment house and providing and leasing apartments therein as permanent homes to its stockholders.

"Senator Vandenberg. How extensive is that practice?

"Mr. Eagle. Well, in New York the investment in 1941 I think was about $350,000,000, and throughout the United States I am told it is vastly in excess of half a billion dollars.

"It allocates its entire capital stock to such apartments according to their size and desirability, and as landlord leases them under what are termed 'proprietary leases.' Every stockholder must be a proprietary lessee and every proprietary lessee of an apartment must own the number of shares of the corporation's capital stock which has been allocated to it.

"Each proprietary lessee agrees to pay as rental for his apartment his pro rata share, based on stock ownership, of the maintenance charges of the cooperative enterprise, including taxes, interest, and general and overhead expenses.

"The cooperative apartment house in its inception was planned as an economic venture whereby several people, desiring to curtail expenses, might acquire and maintain permanent homes in a multiple dwelling building and use a corporation for the purpose of holding title to and managing the property, but without compensation."

It would seem this conception of the fiscal organization of the typical cooperative housing corporation prevailed when subsection (c) was introduced by amendment on the Senate floor during the debate on the Revenue Bill of 1962. Consequently it would be incorrect to say that when section 216(c) was enacted, the Congress presumed that it was customary and indeed proper for the cooperative housing corporation itself to claim depreciation.[7]

The announced purpose of enacting the predecessor of section 216 was to eliminate tax considerations in the choice of the mode of ownership of residential property.[8] The brief legislative statements dealing with section 216(c) indicate that the only reason for adding that section was further to extend the parallelism with the tax treatment of homeownership and condominiums. Congress did not consider whether henceforth both the cooperative housing corporation and the tenant-stockholder who uses his apartment in his trade or business or holds the apartment for the production of income would be entitled to deduct the allocable depreciation. However, we think the Congress intended that the tenant-stockholders alone could claim depreciation under those circumstances, like homeowners and condominium apartment owners.

Apart from the legislative history, the foregoing treatment accords with settled precedents which deny depreciation to persons acting in the capacity of agent or custodian of another's property. It is a fundamental principle that a prerequisite for a deduction under section 167 is an investment in the depreciable asset. *Commissioner* v. *Revere Land Co.*, 169 F. 2d 469, 475 (C.A. 3, 1948), reversing 7 T.C. 1061 (1946), certiorari denied 335 U.S. 853 (1948); *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98 (1943); *Helvering* v. *Lazarus & Co.*, 308

---

[7] It is noteworthy that the colloquy on the Senate floor, like the following excerpt, focused merely on the effect section 216(c) would have on the tenant-stockholder level:

"Mr. Smathers. As I understand the amendment, *it merely permits those persons who buy cooperative apartments* and call them their homes to get the same advantage of the tax deduction for depreciation, and so forth, as people who own their own homes.

"Mr. Kerr. In the event they rent them out.

"Mr. Sparkman. Yes; in the event they rent them out. It places all property ownership on the same level." 108 Cong. Rec. 18383 (1962). (Emphasis supplied.)

[8] S. Rept. No. 1631, 77th Cong., 2d Sess., p. 51: "The general purpose of this provision is to place the tenant stockholders of a cooperative apartment in the same position as the owner of a dwelling house so far as deductions for interest and taxes are concerned."

This sentiment was reiterated by Senator Javits in 1962:

"Mr. Javits. This amendment [adding sec. 216(c)], of course, seeks to take account of the legal form of organization which represents a proprietary lease and a stock interest, which is a quite usual form of organization, for example, in New York City, for cooperatives. As a matter of fact, I happen to have one of those myself. So what this amendment would do, as the Senator [Sparkman] has explained in response to the Senator from Illinois [Douglas], is treat property owners the same across the board, regardless of the form of legal organization of the cooperative, with respect to the availability of deductions for interest, and so forth." 108 Cong. Rec. 18383 (1962).

U.S. 252, 254 (1939); *Robert L. Hunter*, 46 T.C. 477, 490–491 (1966). Petitioner's case is conspicuously deficient in this respect since its economic interest in the apartment building is no more substantial than that of a custodian of the bare legal title to the property. *Weiss* v. *Wiener*, 279 U.S. 333, 337 (1929); *Helvering* v. *Lazarus, supra* at 254. Petitioner is not entitled as the lessor to mortgage or encumber that title. On this record the only business of petitioner (if any) during the taxable years was to manage and maintain the apartment building for its "perpetual" leaseholders.

So far as we can see petitioner before the taxable years had transferred its economic interest in all of the apartments, but one, to its "perpetual lessee(s)." It was simply retaining bare legal title for managerial purposes. We conclude it had no depreciable interest in the apartment building except as allowed by the Commissioner.

The risk of loss due to sudden damage to the apartment building is clearly on the tenant-stockholders. Although it is obligated to repair minor damage, we know that petitioner has few resources which it could apply to its duty and would inevitably be forced to exact extraordinary assessments from the tenant-stockholders; in case of a major disaster, the proprietary lease allows for the liquidation of the cooperative housing corporation and the distribution of the proceeds of any insurance in effect on the apartment building to the tenant-stockholders. Such considerations are some indication to us that the *tenant-stockholders* likewise bear the risk of economic loss due to gradual wear and obsolescence and not petitioner. *Weiss* v. *Wiener, supra* at 335–336; *Helvering* v. *Lazarus, supra* at 254; *Massey Motors* v. *United States*, 364 U.S. 92, 101 (1960); *Harry H. Kem, Jr.*, 51 T.C. 455, 461 (1968), affd. 432 F. 2d 961 (C.A. 9, 1970); *Robert L. Hunter, supra* at 489–491.

We hold that petitioner is not entitled to depreciate such of its property as is allocable and in effect has been disposed of or sold to the perpetual lessees, the tenant-stockholders. The annual depreciation of the steel safe and lawnmower may be deducted. We recognize that the function of holding legal title to the apartment building is distinguishable from that of maintaining the building, and that the equipment that serves the latter function can be separately depreciable because petitioner used it to provide bargained-for services to the tenant-stockholders. Petitioner also may deduct 1.47 percent of the depreciation of the depreciable personal and real property, that is, the fraction attributable to the single apartment leased to a nonstockholder.

Petitioner next contends that the assessments collected for tenant-stockholders each year are not gross income of the corporation and that the Commissioner erred by failing to determine that petitioner

overstated its gross income by such amounts for each of the taxable years in question. At the outset, we agree with petitioner at least to the extent of the amount of assessments that might have been applied each year to the principal amount of the mortgage debt outstanding, though in this case none has been claimed. *874 Park Avenue Corporation*, 23 B.T.A. 400 (1931), acq. X–2 C.B. 21; *Cambridge Apartment Building Corporation*, 44 B.T.A. 617 (1941), acq. 1942–2 C.B. 3; I.T. 1469, I–2 C.B. 191, 192 (1922). It matters little for tax purposes whether the tenant-stockholders contribute the entire purchase price of the land and building in installments rather than all at once.

In many respects this treatment of mortgage amortization is a part of the general rule which we apply in any case to property held in trust by agents, custodians, and pools. In *Seven-Up Co.*, 14 T.C. 965 (1950), acq. 1950–2 C.B. 4, and the cases that followed we held that amounts contributed to a taxpayer with the prior understanding that they would be applied to a common specific purpose of the contributors were not the income of the taxpayer. Here the assessments received from the tenant-stockholders cannot be diverted to corporate purposes unrelated to the operation of the apartment building, indeed each year petitioner has to justify to the tenant-stockholders the level of assessments it plans to impose by showing that the revenue generated will roughly offset a detailed list of anticipated operating expenditures. *Ford Dealers Advertising Fund, Inc.*, 55 T.C. 761, 772–774 (1971), affd. 456 F. 2d 255 (C.A. 5, 1972); *Dri-Power Distributors Association Trust*, 54 T.C. 460, 479 (1970); *N.Y. State Assn. Real Est. Bd. Group Ins. Fund*, 54 T.C. 1325, 1335–1336 (1970). Significantly the only evidence indicating a forbidden profit-making motive, *Krim-Ko Corporation*, 16 T.C. 31, 39 (1951), *Broadcast Measurement Bureau, Inc.*, 16 T.C. 988, 1002 (1951), is the provision in the printed-form proprietary lease that the assessments are to be fixed after deducting estimated income to be derived from sources other than the tenant-stockholders. However, that clause suggests a motive to show no overall profit rather than a motive to make a profit.

It is a matter of indifference to us whether petitioner excludes from income the amounts actually expended on maintenance of the apartment building or returns such amounts as gross income with offsetting deductions therefrom. Likewise the portion of the assessments used to pay State and local taxes should not be taxed to the cooperative housing corporation. This is in keeping with our view that the tenant-stockholders alone are entitled to deduct taxes and that it is they who collectively bear the burdens that give rise to these deductions. It would be unfair to subject to the corporation tax amounts which the cooperative housing corporation for reasons of convenience and local law holds to pay what are really the tenant-stockholders' obligations.

Moreover, to do so would destroy the parallelism in the treatment of cooperatives, condominiums, and homeowners to which we have alluded before.

We add, however, that by holding that the assessments collected from the tenant-stockholders, or part thereof (excluding for the moment the overassessments), are not taxable to the petitioner we do not imply that these amounts are not to be treated as gross income for purposes of the 80-percent test of section 216(b) (1) (D). It is doubtful that any cooperative which had commercial income in addition to tenant-stockholder revenue, as petitioner does, could qualify as a cooperative housing corporation under section 216 if this were not the case. We know that the primary purpose of the 80-percent requirement was to ensure that a corporation otherwise qualifying under section 216 is predominantly and genuinely organized to provide cooperative housing,[9] and we can safely speculate that Congress used the phrase "gross income" as opposed to "receipts" or "revenue" in section 216(b) (1) (D) because it intended that tenant-stockholder assessments should be treated as having the same character as any commercial income of the corporation if only for purposes of the 80-percent minimum.

As we see it, that which remains after parceling out the annual assessments over the foregoing categories of mortgage amortization (if any), taxes, interest, and operations is the overassessments, that is, the excess of the amount collected in a taxable year over the amount refunded or actually expended in that year. We disagree with the Commissioner's assertion that subchapter T, section 1381, et seq., does not apply. Part I of that subchapter applies to the taxable year of any corporation operating on a cooperative basis after December 31, 1962, and that necessarily includes a section 216 cooperative housing corporation. Sec. 1381(a) (2).

We think petitioner has never collected any part of the assessments, overassessments included, under claim of right and has never attempted to divert any part of these funds to general corporate purposes other than the operation of the building. In this regard the reasoning of the Seven-Up Co. case is equally applicable to the overassessments. However Congress has provided in subchapter T for convenient procedures pursuant to which the cooperative corporation can avoid being taxed on the overassessments. Congress also decided that it is not sufficient for petitioner simply to carry the overassessments

---

[9] The brief technical description of the section in the Revenue Bill of 1942 stated: "The definitions of the terms 'cooperative apartment corporation' and 'tenant-stockholder' prescribe certain standards which are designed to safeguard the revenue by assuring that the apartment corporations involved are bona fide cooperative apartment corporations and that the individuals entitled to deductions under section 23(z) [sec. 216] are bona fide tenant-stockholders of such corporations." S. Rept. No. 1631, 77th Cong., 2d Sess., p. 97 (1942).

on its books to the credit of the tenant-stockholders indefinitely, if it is to be entitled to a tax benefit therefrom.

The duration of the period of limitations on retained overassessments of nonexempt cooperatives, which includes petitioner here, was the source of some controversy for taxable years prior to 1963, but the statute now clearly establishes a period ending 8½ months after the close of the cooperative's calendar year.

The overassessments fall under the statutory category of patronage dividends. Sec. 1388(a).[10] Section 1382(b)(1) provides for the deduction of patronage dividends paid within the payment period for each taxable year. The payment period begins on the first day of the taxable year and ends on the fifteenth day of the ninth month following the close of that year. Sec. 1382(d). To be deductible under section 1382(b)(1), the patronage dividends must be paid in money, qualified scrip, or other property. The evidence discloses that petitioner customarily accumulated the overassessments from year to year. In our Findings of Fact we stated, on the assumption that petitioner continued this practice in 1966 and in the absence of direct evidence to the contrary, that petitioner did not refund the 1966 overassessment in money within 8½ months after the close of the calendar year. The financial statements submitted for the approval of the tenant-stockholders each year do no constitute scrip or "written notices of allocation" as defined by section 1388(b) and section 1.1388–1(b), Income Tax Regs., and so we do not have to determine whether such statements qualified otherwise as deductible patronage dividends under section 1382(b)(1) and section 1388(c). Thus, as the 1966 overassessments are not deductible from petitioner's gross income either as patronage dividends or in any other form, petitioner must include them in its gross income for that year. The balance of the assessments is not taxable to the petitioner.

[10] Sec. 1.1388–1 (a), Income Tax Regs., provides:

(a) *Patronage dividend*—(1) *In general*. The term "patronage dividend" means an amount paid to a patron by a cooperative organization subject to the provisions of part I, subchapter T, chapter 1 of the Code, which is paid—

(i) On the basis of quantity or value of business done with or for such patron,

(ii) Under a valid enforceable written obligation of such organization to the patron to pay such amount, which obligation existed before the cooperative organization received the amount so paid, and

(iii) Which is determined by reference to the net earnings of the cooperative organization from business done with or for its patrons.

For the purpose of subdivision (ii) of this subparagraph, amounts paid by a cooperative organization are paid under a valid enforceable written obligation if such payments are required by State law or are paid pursuant to provisions of the bylaws, articles of incorporation, or other written contract, whereby the organization is obligated to make such payment. The term "net earnings", for purposes of subdivision (iii) of this subparagraph, includes the excess of amounts retained (or assessed) by the organization to cover expenses or other items over the amount of such expenses or other items. * * *

Reviewed by the Court.

*Decision will be entered under Rule 50.*

SIMPSON, *J.*, did not participate in the consideration and disposition of the case.

---

STERRETT, *J.*, dissenting: The majority's holding that the overassessments represent taxable income to the cooperative will produce some unintended and illogical results. For example, the cooperative now has earnings and profits which the Commissioner can label as the source of any distribution to its members. Presumably, then, if the governing body overestimates the cooperative's expenses for one year and refunds the overpayment the following year, the member is in receipt of dividend income. Surely Congress never intended such a bizarre result.[1]

If all receipts by the cooperative are to be treated as income, then it should be entitled to all the offsetting business expenses, including depreciation.

FORRESTER, *J.*, agrees with this dissent.

---

[1] While it is not free from doubt, it may be that sec. 1382(d) would prevent such a bizarre result from occurring if the refund is made within 8½ months of the close of the taxable year.

